260 N.J. Super. 227 (1992)
615 A.2d 1264
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
STUART MODELL, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 13, 1992.
Decided November 4, 1992.
*231 Before Judges J.H. COLEMAN, SHEBELL and CONLEY.
Larry Blumenstyk argued the cause for appellant (Larry Blumenstyk and David Wendel, on the brief; Catherine Langlois, on the reply brief).
Mark Paul Cronin, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General, attorney; Mark Paul Cronin, of counsel and on the brief).
The opinion of the court was delivered by SHEBELL, J.A.D.
Defendant, Stuart Modell, appeals from his jury convictions on two counts of third-degree theft by failure to make required disposition of property received (counts one and four) (N.J.S.A. 2C:20-9); three counts of second degree theft by failure to make required disposition of property received (counts six, eight and ten) (N.J.S.A. 2C:20-9); two counts of third-degree misapplication of entrusted property (counts two and five) (N.J.S.A. 2C:21-15); three counts of second-degree misapplication of entrusted property (counts seven, nine and eleven) (N.J.S.A. 2C:21-15); and one count of third-degree theft by deception (count twelve) (N.J.S.A. 2C:20-4). He also appeals from the aggregate sentence imposed of seven years with three and one-half years of parole ineligibility.
At the commencement of defendant's first trial, count three was dismissed on the State's motion because the victim was unable to testify as a result of Alzheimer's disease. Defendant's first trial began on June 25, 1990 but ended when the trial judge sua sponte declared a mistrial as to all remaining *232 counts. After the State rested its case in the first trial, defendant moved for dismissal of the counts concerning misapplication of entrusted property on the basis that defendant derived no benefit from the alleged misapplications. The court denied this motion. The defendant also renewed a pretrial motion to dismiss counts four and five because of the statute of limitations. The court found that the elements constituting this crime were completed on August 13, 1984 and that, therefore, the five-year statute of limitations had not yet run when the indictment was returned on August 2, 1989.
On July 2, 1990, as defense counsel was called upon to begin his case, he expressed concern that the alleged victim of counts one through five who had appeared on behalf of the State would fail to appear for defendant's case with certain records, even though he had been served with two subpoenas. The judge stated that he considered striking the testimony of the witness as presented on the State's case, which would have necessitated dismissal of counts one, two, four and five, but instead the judge declared a mistrial sua sponte.
After the first trial, defendant moved to dismiss the indictment on double jeopardy grounds. The motion was denied by the trial judge on October 5, 1990. In denying the motion, the judge recited his reasons for finding that "manifest necessity" existed for declaration of a mistrial sua sponte. On October 9, 1990, defendant applied to this court for emergent relief from the order denying his motion to dismiss on the grounds of double jeopardy. We denied leave to appeal. Defendant then moved to dismiss counts four and five as barred by the statute of limitations. This motion was denied on December 6, 1990. Defendant again sought leave to appeal which we denied.
Defense also moved to sever counts six through twelve from counts one, two, four, and five, and to sever counts eight and nine from counts six, seven, ten, eleven, and twelve. The motion was denied at the time of commencement of the second trial. Defendant's second trial commenced on February 4, *233 1991. He was convicted by a jury of all eleven counts of the indictment. Defendant filed a motion for a judgment of acquittal after the verdict of guilty and a motion for a new trial, which were denied.
In this appeal defendant raises the following legal arguments:

POINT I: JEOPARDY ATTACHED IN THE FIRST TRIAL.

POINT II: THE SUA SPONTE MISTRIAL WAS AN IMPROPER TERMINATION OF THE FIRST TRIAL.
A. JUDGE KUECHENMEISTER'S SOLICITUDE FOR PERCEIVED UNFAIRNESS TO STUART MODELL IS IRRELEVANT IN DETERMINING WHETHER TO DECLARE A MISTRIAL SUA SPONTE.

B. THE TRIAL COURT'S FINDING OF MANIFEST NECESSITY TO DECLARE A MISTRIAL IS COMPLETELY UNSUPPORTED BY THE RECORD CONTAINING NO ARGUMENT OR DELIBERATION REFLECTING AN URGENT NEED TO DISCONTINUE THE TRIAL. SIMPLY, THE MISTRIAL WAS AN ARBITRARY, UNLIMITED AND UNCERTAIN EXERCISE OF JUDICIAL DISCRETION.
C. THERE WAS NO LEGAL REASON TO DECLARE A MISTRIAL.

POINT III: THE REPROSECUTION OF MR. MODELL IS BARRED BY THE UNITED STATES CONSTITUTIONAL PRINCIPLE OF DOUBLE JEOPARDY.

POINT IV: THE REPROSECUTION OF MR. MODELL IS BARRED BY THE NEW JERSEY CONSTITUTION.

POINT V: THE CONVICTIONS ON COUNTS VI THROUGH XII SHOULD BE OVERTURNED ON GROUNDS OF DOUBLE JEOPARDY BECAUSE THERE WAS ABSOLUTELY NO LEGAL REASON TO MISTRY THESE COUNTS AT THE CONCLUSION OF THE FIRST TRIAL.

POINT VI: STUART MODELL WAS PREJUDICED BECAUSE THE SECOND TRIAL SHOULD HAVE BEEN SEVERED TO PRODUCE NO FEWER THAN THREE INDEPENDENT TRIALS.

POINT VII: THE HEARSAY TESTIMONY OF THOMAS HEATH, COUPLED WITH THE PREJUDICE ARISING FROM THE DENIAL OF OUR SEVERANCE MOTION WAS ANYTHING BUT HARMLESS AND CONSTITUTES REVERSIBLE ERROR.

POINT VIII: THERE WAS NO EVIDENCE THAT STUART MODELL BENEFITTED FROM THESE TRANSACTIONS.

POINT IX: PROSECUTION OF COUNTS FOUR AND FIVE SHOULD HAVE BEEN PRECLUDED BECAUSE ALL OF THE ELEMENTS EXISTED PRIOR TO AUGUST 2, 1984, MORE THAN FIVE YEARS BEFORE THE AUGUST 2, 1989 INDICTMENT.
A. THE OFFENSE CHARGED IN COUNTS FOUR AND FIVE ARE NOT CONTINUING.

*234 B. OFFICERS AND EMPLOYEES OF FINANCIAL INSTITUTIONS VIOLATE N.J.S.A. 2C:20-9, EVEN IF THEY DO NOT DEAL WITH ANOTHER'S PROPERTY AS THEIR OWN.
C. IF A SHOWING OF BENEFIT IS NOT REQUIRED TO VIOLATE N.J.S.A. 2C:21-5 THEN COUNT FIVE IS BARRED BY THE STATUTE OF LIMITATIONS.

POINT X: PAROLE INELIGIBILITY TERMS CANNOT BE ATTACHED AS A MATTER OF COURSE.
The facts reflect that in 1983, defendant was hired by an insurance agency in Glen Rock as an agent. In the spring of 1984, it was decided that the defendant would establish a plan to sell 401k retirement plans. Defendant supervised other agents and conducted seminars involved with the 401k plans. He was introduced at these seminars as the president of Pension Employee Benefit, Inc., a consulting firm that defendant had started. The new firm shared offices with the insurance agency, but had no other connections to the parent insurance company.
Several checking accounts were established for the new firm, all of which were associated with defendant in some way. A checking account of the agency was used to pay the expenses of the 401k program; however, the account was not to be used as a depository for funds provided by clients for investments. Funds received for investments had to be remitted directly to Equitable, the parent insurance company. This requirement was included in defendant's agent-contract and was in the handbook given to all agents by the insurance company.
The defendant and his wife were responsible for managing the agency's 401k expense checking account. Both were authorized to write checks from the account and both maintained the receipts and disbursements account journal for the 401k program. This account was established for the specific purpose of paying the expenses involved with the 401k program. Defendant and his wife received a salary or a draw against future commissions from this account. The 401k program incurred substantial expenses at the beginning of the operation.
*235 Edward Karalanian, the alleged victim of counts one, two, four, and five, manufactured jewelry in New York City. He first consulted with the defendant in November 1983 about establishing a pension plan. Karalanian had $75,000 invested with Merrill Lynch. Defendant took the steps necessary to establish a defined benefit plan for Karalanian. Eventually, a check was sent from Merrill Lynch to the insurance agency in the amount of $42,554.20. On August 13, 1984, defendant endorsed the check and deposited it into his personal account at Valley National Bank. Defendant sent a letter to Merrill Lynch confirming that the amount transferred had "opened a Defined Benefit Keough Plan with the Equitable Life." On September 14, 1984, defendant wrote to Karalanian confirming that Merrill Lynch had transferred the funds. Karalanian testified that he never signed a contract with the defendant and, despite requests, never received any account statements for the defined benefit plan.
Karalanian also had money invested with Charter Security Life Insurance Company (Charter) for his son's education. Defendant advised Karalanian that Charter was experiencing financial difficulties and convinced him to deposit that money with the Equitable. Two checks were issued by Charter on August 13, 1984 in the total amount of $23,850.70. Karalanian and defendant endorsed the checks, which defendant deposited into his personal bank account on September 12 and 14, 1984.
On December 26, 1984, defendant sent a letter to Karalanian stating that $22,633 was deposited with the Equitable to establish a Life Variable Account for Karalanian's son. Karalanian testified that he never received any documentation of this account. In February 1985, Karalanian instructed defendant to terminate the above account and return the money to him. It was refunded in three increments: (1) $7,500 on November 19, 1985, (2) $7,500 on November 27, 1985, and (3) $15,000 on December 4, 1985. Karalanian also testified that in 1986, he and his attorney confronted defendant about the money that was supposed to be invested in the defined benefit plan. Karalanian *236 eventually received a check for the money he had invested plus interest.
The second set of transactions involved members of the Pugliese family and Swimming Pool Equipment and Construction Company, Inc. (SPECS). Thomas Heath, Anthony Pugliese's son-in-law, was the president of SPECS. Both Mr. Pugliese and his spouse, Jennifer, testified at the first trial; however, neither testified at the second trial as Mr. Pugliese was severely ill and resided in Florida with his wife.
Heath met defendant in November 1983 and decided to establish a defined benefit plan for SPECS. Heath testified that he and Anthony Pugliese also met with defendant and that any decisions were made by both of them. Two checks were issued to defendant from the SPECS corporate account. One was issued on October 24, 1984 for $11,000. The second check was issued on November 2, 1984 for $7,500. Heath testified that the checks were made out to defendant personally because defendant represented that he had taken his own personal money and invested it for SPECS. The checks were deposited in defendant's personal account on October 25 and November 2, 1984, and were eventually transferred to the agency expense account. In December 1984, Heath wrote four checks to defendant totaling $70,000 for the SPECS plan. These checks were deposited in the agency expense account.
Anthony and Jenny Pugliese also decided to fund personal retirement plans in the amounts of $50,000 each at an interest rate of 13.25%. The money was given to defendant in various increments between November 1984 and January 1985. Defendant verified the transfer of $100,000 cash in writing as follows: on November 15 ($18,000), November 21 ($18,000), November 27 ($18,000), November 27 ($28,000), and January 10 ($18,000). During this time, cash deposits in the amount of $88,400 were made to defendant's personal account, his wife's personal account, and the agency expense account.
*237 At defendant's suggestion, Mr. Pugliese also agreed to invest in a six-month certificate of deposit from Equitable with an interest rate of 13.25%. Equitable, however, does not deal with any transactions involving certificates of deposit. Heath wrote a check to defendant for $50,000 which was signed by Pugliese on March 22, 1985. The check was turned over to defendant. Defendant wrote to Pugliese verifying that the $50,000 check had been deposited with the Equitable Financial Services at 13.25% interest. This check was deposited into the agency expense account.
The Puglieses and SPECS demanded documentation of the company's pension plan. On July 10, 1985, a letter was written by defendant stating that the Equitable office in Glen Rock had received a total of $150,000 for the retirement plans and for the certificate of deposit. On July 12, 1985, defendant executed a promissory note for $150,000 with 13.25% interest payable to Mr. Pugliese. Defendant delivered a Contribution Statement reflecting the amount remitted to the SPECS pension plan of $88,755.15, and on July 31 and August 15, 1985, Equitable sent letters confirming the SPECS account.
On July 12, 1985, Heath discussed the SPECS pension fund with another Equitable agent who agreed to look into the matter. After receiving the documents purportedly issued by Equitable, the agent began an investigation. Eventually, as a result of the investigation, an auditor contacted both Heath and Pugliese. During this time, the transactions giving rise to the additional counts of the indictment occurred. Media Buying Services, Inc. (Media) had become unhappy with the company handling its 401k plan. Kenneth Vernon, a partner at Media, attended a seminar presented by defendant. Defendant informed him that the Equitable 401k plan would better meet the needs of Media.
On July 16, 1985, Vernon obtained a check for $44,235.88 from the company that had been servicing Media's 401k plan. Defendant traveled to Media's office in New York City and *238 picked up the check. On August 7, 1985, Vernon received a second check for $44,519.25 which was also given to defendant. Both checks were deposited into the agency expense account. On July 29 and August 14, 1985, defendant wired the same amount of money to Equitable, but he caused it to be deposited into the SPECS account.
After Equitable completed its investigation, a meeting was held on September 24, 1985 to discuss the matter. Defendant and the owner of the agency were at the meeting, along with defendant's wife and several Equitable officers. After defendant was informed that an investigation had revealed that no insurance policies had been purchased for the Puglieses, that no accounts for either Karalanian or his son had been established, and that no account for Media existed, he admitted using the funds for business expenses pertaining to the 401k program.
Defendant testified at his trial. He admitted that he had diverted the funds given to him by Karalanian and the Puglieses and that he had used the Media funds to establish the SPECS pension plan. However, he asserted that these funds had been loaned to him to finance Pension Employee Benefit, Inc. Defendant contended that Anthony Pugliese gave him a loan with the understanding that defendant would pay the current interest rate on certificates of deposit. Defendant confirmed that he used the SPECS and Pugliese funds to cover the expenses of the 401k plan, and used Media's funds to repay SPECS.

I.
Defendant asserts that the trial judge erred by declaring a mistrial sua sponte and that his reprosecution is barred on the grounds of double jeopardy. He claims there was no "manifest necessity" and that the trial judge declared a mistrial without considering other alternatives.
The Double Jeopardy Clause of the United States Constitution provides  "nor shall any person be subject for the same *239 offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The federal constitutional protection of the Double Jeopardy Clause is made applicable to the states through the Fourteenth Amendment. Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). The New Jersey Constitution provides that "[n]o person shall, after acquittal, be tried for the same offense." N.J. Const. art. 1, ¶ 11. Our New Jersey courts have held that the federal and state constitutional provisions are coextensive. State v. Dively, 92 N.J. 573, 583-84, 458 A.2d 502 (1983); State v. Bowen, 224 N.J. Super. 263, 273 n. 2, 540 A.2d 218 (App.Div.), certif. denied, 113 N.J. 323, 550 A.2d 442 (1988).
In a criminal case that is tried to a jury, jeopardy attaches when the jury is impaneled and sworn. State v. Howard, 235 N.J. Super. 243, 254, 561 A.2d 1202 (App.Div.), certif. denied, 118 N.J. 206, 570 A.2d 966 (1989), cert. denied, 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1070 (1990); State v. Travers, 229 N.J. Super. 144, 149, 550 A.2d 1281 (App.Div. 1988). The United States Supreme Court recognizes that the trial judge must be given a wide range of discretion in determining whether a mistrial should be declared. See Illinois v. Somerville, 410 U.S. 458, 462, 93 S.Ct. 1066, 1069, 35 L.Ed.2d 425, 429 (1973); Brock v. North Carolina, 344 U.S. 424, 427, 73 S.Ct. 349, 351, 97 L.Ed. 456, 459 (1952) ("This Court has long favored the rule of discretion in the trial judge to declare a mistrial and to require another panel to try the defendant if the ends of justice will be best served.").
Our New Jersey courts similarly grant the trial judge a wide range of discretion in granting a mistrial. See State v. Farmer, 48 N.J. 145, 171, 224 A.2d 481 (1966), cert. denied, 386 U.S. 991, 87 S.Ct. 1305, 18 L.Ed.2d 335 (1967). The determination of whether a manifest necessity existed for declaring a mistrial will depend on the circumstances of each case. "What constitutes `manifest necessity' depends upon the particular *240 facts of each case." State in the Interest of D.P., 232 N.J. Super. 8, 13, 556 A.2d 335 (App.Div. 1989).
If the defendant moves for a mistrial, the Double Jeopardy Clause will rarely bar a second trial. "Only where the governmental conduct in question is intended to `goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." Oregon v. Kennedy, 456 U.S. 667, 676, 102 S.Ct. 2083, 2089, 72 L.Ed.2d 416, 425 (1982). The former restrictive rule of Gori v. United States, 367 U.S. 364, 369, 81 S.Ct. 1523, 1526, 6 L.Ed.2d 901, 905 (1961) that if a trial judge declared a mistrial sua sponte, the Double Jeopardy Clause would not bar a retrial only where the mistrial had been granted for the sole benefit of the defendant, no longer prevails. Somerville, supra, 410 U.S. at 471, 93 S.Ct. at 1074, 35 L.Ed.2d at 435. Therefore, if a mistrial upholds a reasonable state policy and "aborts a proceeding that at best would have produced a verdict that could be upset by one of the parties," a defendant's interest in receiving a verdict may be outweighed by the "equally legitimate demand for public justice." Ibid. Therefore, the defendant's interests no longer have to be the sole consideration when a trial judge declares a mistrial sua sponte. Ibid. In State v. Laganella, 144 N.J. Super. 268, 365 A.2d 224 (App.Div.), app. dismissed, 74 N.J. 256, 377 A.2d 652 (1976), we stated that "we have become increasingly candid in our facing up to an awareness that important interests other than those of defendant alone are involved in the trial of criminal cases." Id. at 287, 365 A.2d 224.
Defendant nonetheless argues that the holding in Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963), requires reversal of his conviction on retrial. However, in Downum the State's key witness was not available because the prosecution had failed to take proper action to ensure the witness' attendance. Id. at 737, 83 S.Ct. at 1035, 10 L.Ed.2d at 103. In this case, the State did not contribute to the unavailability of the witness. The trial judge correctly found that the *241 subpoenas issued by the defense to the witness were confusing. They were also served on short notice. By the time all concerned realized that the witness had delivered the documents but would not appear, the witness had left the country for a six-month stay in Europe. Defense counsel had been made aware of the witness' travel plans, and, in view of the language of the two subpoenas, it was not unexpected that he would not personally appear. As the Court in Downum stated, "we refuse to say that the absence of witnesses `can never justify discontinuance of a trial.' Each case must turn on its facts." Ibid.
In Farmer, supra, 48 N.J. at 171, 224 A.2d 481, our Supreme Court, in holding that the trial judge did not err in declaring a mistrial over the objection of the parties, declared:
A wide range of discretion is recognized in the trial judge, who has his finger on the pulse of the proceedings. If in his judgment emergent conditions come into being which persuade him that the ends of justice for the defendant and the State cannot be achieved without aborting the trial, neither the Federal nor the State Constitution proscribes such an order. This is particularly true where the circumstances which to him compel the order do not bespeak bad faith or oppressive conduct by the prosecution or a desire or effort to improve the chances of conviction at a subsequent trial. See United States v. Tateo, 377 U.S. 463, 468, fn. 3, 84 S.Ct. 1587 [1590, fn. 3], 12 L.Ed.2d 448, 452 (1964). In this sensitive area appellate courts must realize that under our system the conduct of a trial is committed to the trial judge, and that in appraising the exercise of his discretionary action a wise and tolerant restraint must be practiced if the separate levels of the judicial process are to be maintained. And appellate reluctance to interfere with a sua sponte declaration of a mistrial should be even more pronounced where it is plain that a primary motive for the trial judge's course was solicitude for the defendant's interests. Gori v. United States, supra; Scott v. United States, 91 U.S.App.D.C. 232, 202 F.2d 354 (D.C. Cir.1952); United States v. Giles, 19 F. Supp. 1009 (W.D.Okla. 1937). [Ibid.].
The Court's analysis reflects the reason for the basic principle that each case must turn on its particular facts:
Clearly the societal right to have the accused tried and punished if found guilty stands side by side with the right of the accused to be prosecuted fairly and not oppressively. While the public right, when it must be considered alone, may not weigh as heavily in the scale as that of the defendant because of the constitutional dimensions of the privilege against double jeopardy and the superior capacity of the State to investigate and prepare for prosecutions, nevertheless when exercise of the trial court's discretion may fairly be said *242 to serve both interests, there is certainly less substantial reason to question its propriety. [Id. 48 N.J. at 175, 224 A.2d 481 (emphasis added)].
In arriving at the decision to declare a mistrial sua sponte, "trial judges [should not] foreclose the defendant's option until a scrupulous exercise of judicial discretion leads to the conclusion that the ends of public justice would not be served by a continuation of the proceedings." United States v. Jorn, 400 U.S. 470, 485, 91 S.Ct. 547, 557, 27 L.Ed.2d 543, 557 (1971); see also Arizona v. Washington, 434 U.S. 497, 515-16, 98 S.Ct. 824, 835-36, 54 L.Ed.2d 717, 734 (1978) (trial judge is in the best position to determine whether harmful error would result thereby necessitating a mistrial).
In the present case, when it appeared that the witness was not going to appear, defense counsel stated that the witness' testimony should be stricken. The trial judge properly concluded that the requested relief would have been inappropriate as contrary to the public's interest. Service of the subpoenas was made by defendant on June 25 and 26, 1990. Defense counsel apparently intended that the witness should appear and produce documents on July 2, 1990. Counsel, however, was aware that the witness planned to leave the country on July 1, 1990. In addition, the subpoenas appeared not to require that the witness appear again at trial as long as he produced the documents. The witness therefore responded to the subpoena duces tecum by sending the documents to a judge's chambers. The subpoena ad testificandum also stated that delivery of the documents would be sufficient to satisfy the demand for appearance.
Defense counsel, however, endeavored to make it appear that production of the documents alone without Karalanian was insufficient to protect his client's rights. Counsel stated, "I'm entitled to have Mr. Karalanian here." The court then asked the attorney: "[W]hy [do] you feel you need Mr. Karalanian." Counsel responded:
I have to lay a foundation, Judge, for some of the testimony of my client through Mr. Karalanian.

*243 First of all, there has been some testimony which I submit was incredible with regard to the source of funds which he had and what he could do about it. I mean, the reason that we ultimately did have a subpoena which your Honor approved regarding certain tax records, was that that was inherently incredible and that I was going to try to have him bring those tax returns so Mr. Modell could ultimately testify as to the true facts with regard to his business position and his tax position. Mr. Karalanian could not be cross examined with regard to that because I didn't have those documents to confront him with.
There is further testimony to be gotten from Mr. Karalanian with regard to numerous insurance policies which are part of the plans to be established which were in fact in place. There were a course of dealings between these two people which was favorable and which is consistent with the theory well advanced that my client was authorized to do certain thing with these funds delivered to him, other than what appears from the State's case. When Mr. Karalanian took the stand and told the jurors that he grossed $450,000 in a particular year and that's the first time that he had gotten that kind of money, he also said he had no idea that that was happening. That is incredible and I need to go further and to show what it is.
I have a few other things that I think I was going to show with Mr. Karalanian. There is an IRA established, there are funds put aside for his son. All we focused on were the transactions authorized. When you look at those transactions with other transactions, we have a completely different picture. To have my client say that when this could be gleaned from the supposed victim, Judge, is devastating; it's a whole different story. That's why I lined up Mr. Karalanian and to have Mr. Karalanian come in and talk about the complaints and not fight the subpoena to put documentary evidence before the jury which refutes some of his claims is all devastating. That's why I need him; that's why I subpoenaed him and that's why if he doesn't appear and if in fact he's gone to Europe, which is a real possibility in this case, I think his testimony should be  this a question of adequate due process and not sparring with the State.
The trial judge recessed twice for extended periods of time and then, after informing counsel that he had considered striking the testimony of the witness, which would have resulted in dismissal of counts one, two, four, and five of the indictment, he continued:
However, due to the ambiguity of the subpoena language, such a sanction seems unnecessarily harsh. Similarly, [defendant], by his attorney, desired the appearance of [the witness] on its case in chief. As stated before, due to the ambiguity in the subpoena, [the witness] is not before the Court. It would seem devastating unfair to the defendant to force him to proceed without a witness he has deemed necessary.
Although the court did not give an extended dissertation about the reasons for declaring a mistrial at that time, this is not *244 dispositive. See Arizona v. Washington, 434 U.S. 497, 516, 98 S.Ct. 824, 835, 54 L.Ed.2d 717, 735 (1978) (holding that where there is no explicit finding of "manifest necessity" on the record, if the record provides sufficient justification for the ruling, the failure to explain that ruling more completely does not render it constitutionally defective). The court, when it ruled on defendant's motion to dismiss on double jeopardy grounds, more specifically stated its reasons for granting the mistrial:
Possible alternatives considered by the Court were to (1) strike the testimony of Mr. Karalanian for his voluntary absence from the trial while under lawful subpoena, thereby requiring a dismissal of counts one, two, four and five of the Indictment; (2) deny the motion to strike Mr. Karalanian's testimony, thereby forcing the Defendant to proceed without the benefit of a witness he deemed necessary, or (3) declare a mistrial.
....
Had this Court stricken the testimony of Mr. Karalanian, counts one, two, four and five would have been dismissed and there would have been a substantial risk that the State's case with respect to the remaining counts would have been seriously undermined due to a loss of credibility with the jury.
Conversely, had the Court denied the motion to strike Mr. Karalanian's testimony, the Defendant's case would have been prejudiced due to the fact that he would have been forced to proceed without a witness whom he deemed devastatingly important.
It cannot therefore be said that the trial judge's course was directed solely by consideration of one party's interests over another's. The positions of both sides were analyzed objectively and no abuse of discretion or hint of bad faith on either the part of the trial judge or the prosecution besmirched the decision.
Accordingly, it is the opinion of this Court that under the facts of this case, the declaration of a mistrial was manifestly necessary. Therefore, retrial will not be barred and the motion is denied.
The trial judge did not abuse his discretion in these circumstances. The State was not responsible for the witness' failure to appear, nor did the judge declare a mistrial for the sole reason that the State would have a better chance of prosecuting the defendant in a second trial. The language of the subpoena which contributed to the witness' lack of appearance was defendant's responsibility, and defense counsel clearly stated that it was necessary for the defense to have the testimony of the *245 witness. We are convinced that the declaration of a mistrial by the court served the ends of public justice while at the same time it protected the defendant's rights. It should not be disturbed.

II.
The defendant argues that, for a number of reasons, he was prejudiced because the second trial should have been severed into no less than three independent trials. The State argues that the three sets of transactions were part of a common plan, and that because evidence of each transaction would be admissible in other independent trials, this further weighed against severance.
In matters relating to severance, a wide range of discretion necessarily reposes in the trial judge. A denial of a motion for severance will thus not result in reversal, absent a mistaken exercise of that discretion. Although it is recognized that a trial of multiple charges probably will involve some potential of harm, since the multiplicity alone may possibly suggest to the jury a propensity to criminal conduct, other considerations, such as economy and judicial expediency, must be weighed by the judge in making his determination whether to sever.
The interests of economy and efficiency may require that similar or related offenses be joined for a single trial, so long as the defendant's right to a fair trial remains unprejudiced. [State v. Coruzzi, 189 N.J. Super. 273, 297-98, 460 A.2d 120 (App.Div.), certif. denied, 94 N.J. 531, 468 A.2d 185 (1983) (citations omitted)].
R. 3:7-6 provides for the joinder of offenses:
Two or more offenses may be charged in the same indictment or accusation in a separate count for each offense if the offenses charged are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan. Relief from prejudicial joinder shall be afforded as provided by R. 3:15-2. [R. 3:7-6].
R. 3:15-2 provides:
(b) Motion by Defendant and State. If for any other reason it appears that a defendant or the State is prejudiced by a permissible or mandatory joinder of offenses or of defendants in an indictment or accusation the court may order an election or separate trials of the counts, ... or direct other appropriate relief. [R. 3:15-2(b)].
*246 In Coruzzi, the arguments made by the defendant and the State were the same as those made by the respective parties here. We held in Coruzzi that:
It is clear that where there is a course of conduct on the part of a defendant such as to make evidence of one transaction relevant to any other transaction for the purpose of establishing motive, intent or common scheme or plan, then the trial judges may properly deny severance. This is because a defendant will not suffer any more prejudice in a joint trial than he would in separate trials, because the evidence of the other alleged crimes would be admissible in any event under Evid.R. 55. [Id. 189 N.J. Super. at 299, 460 A.2d 120].
Here, the trial court did not abuse its discretion by refusing to sever the various charges. It was essential to the State's case that the entire fabric of defendant's conduct be displayed to the jury. See id. at 300-01, 460 A.2d 120.
Evidence of other crimes is admissible under Evid.R. 55 when it demonstrates that the other crimes have stemmed from a singular motive with one particular goal in mind. State v. Zicarelli, 122 N.J. Super. 225, 240, 300 A.2d 154 (App.Div.), certif. denied, 63 N.J. 252, 306 A.2d 455 cert. denied, 414 U.S. 875, 94 S.Ct. 71, 38 L.Ed.2d 120 (1973). The defendant himself admitted that all of the funds from the three sets of transactions involving Karalanian, the Puglieses, and Media were meant to be loans for payment of the expenses of Pension Employee Benefit, Inc. Clearly, the alleged diversion of the funds stemmed from the singular motive of paying off the expenses of the 401k plan. Also, defendant used funds from Media to repay SPECS. Further, all of the transactions took place around the same time.
The trial judge instructed the jury several times that it had to determine defendant's guilt on each of the counts separately. It must be assumed that the jury followed the trial court's instructions. See State v. Manley, 54 N.J. 259, 270, 255 A.2d 193 (1969).
We conclude that the trial court's determination regarding severance was not an abuse of discretion, nor does it appear *247 that defendant was so prejudiced by the consolidation of the charges that he was denied a fair trial.

III.
Defendant contends that the hearsay testimony of Mr. Heath, coupled with the denial of the severance motion, constituted reversible error. Because Pugliese and his wife did not testify, Heath was the only State's witness regarding the transactions between defendant, SPECS, and the Puglieses. Defendant contends that Heath's testimony regarding the terms and agreements of these transactions constituted inadmissible hearsay. The State maintains that the trial judge was correct in admitting Heath's testimony because Heath was only testifying to his own actions and actions of others which he witnessed. The State argues that:
the statements would reflect the state of mind or intent of Anthony Pugliese in giving the money to defendant, and defendant's knowledge of what was expected of him when he took the money. These statements would be verbal acts creating a contract between the parties with a concomitant legal obligation in defendant.
Hearsay is defined as "a statement offered to prove the truth of the matter stated which is made other than by the witness while testifying...." Evid.R. 63. Hearsay error, depending on the circumstances, may be harmless error or it may require reversal. To bring about reversal, "[t]he possibility [of an unjust verdict] must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." State v. Hightower, 120 N.J. 378, 410, 577 A.2d 99 (1990) (quoting State v. Bankston, 63 N.J. 263, 273, 307 A.2d 65 (1973)).
Heath testified that both he and Pugliese dealt with defendant in establishing a defined benefit plan for SPECS, but that Heath was primarily responsible for negotiating the implementation of the retirement plans for the Puglieses. At one point, Heath testified:

*248 Q [BY DEPUTY ATTORNEY GENERAL] Did you at some point actually forward money to Modell as part of your agreement to set up this retirement plan for the business?
A Yes, we did.
Q And in what form was the money tendered?
A Checks, corporate checks.
Q And did you give checks to Modell with specific instructions?
A Well, we told him to 
[DEFENSE COUNSEL]: Excuse me. Objection to "we told," Judge. What the witness told 
THE COURT: Yes. We're concerned as to who told what to who, so when you say "we," it's not clear.
Q [BY DEPUTY ATTORNEY GENERAL] Did you give instructions to defendant with respect to checks that were going to be invested into the retirement plan?
A The instructions were everything that we had talked about prior to the money 
[DEFENSE COUNSEL]: Objection, Judge. Now the question was specific, but the answer was not responsive.
THE COURT: By "we" you mean the defendant and you?
[DEPUTY ATTORNEY GENERAL]: Your Honor, perhaps I could ask him another question 
THE COURT: Yes, let's find out what the "we" is.
A "We" is my father-in-law and myself and Stuart Modell collectively we had agreed that the money was to be 
[DEFENSE COUNSEL]: Objection.
THE COURT: I'll allow it. He's answering the question. Answer it.
The trial judge allowed the testimony after Heath explained who he was referring to when he said "we" and that he was personally involved with the transactions. Heath testified as to the terms of the transactions and the money that was tendered to defendant. Heath also testified about the actions he and Pugliese took in terms of establishing the various accounts.
Heath testified as to his understanding of what was to happen with the money once it was turned over to defendant. Although Heath originally tried to testify as to Pugliese's understanding, defense counsel objected, and thereafter Heath limited his testimony to his own understanding of the transactions. Defense counsel also objected when Heath testified that *249 "[m]y father-in-law was getting more and more concerned about where the documents were."
Evid.R. 19 provides that:
As a prerequisite for the testimony of a witness there must be evidence that he has personal knowledge of the matter, or experience, training, or education, if such be required.... The judge may reject the testimony of a witness that he perceived a matter if he finds that no trier of fact could reasonably believe that the witness did perceive the matter. [Evid.R. 19].
Heath testified that he was personally involved with all the transactions that took place between Pugliese and defendant. Although the record is not entirely clear, it does not appear that Heath was testifying as to statements made by Pugliese; rather, he appeared to be giving his perceptions of the transactions as he observed and understood them. Heath's testimony about the checks that were transferred between defendant and Pugliese did not constitute statements of another used to prove the truth of the matter stated.
Heath's testimony as it related to Pugliese's intent in several instances fell under the hearsay exception of Evid.R. 63(12) which states:
A statement is admissible if it was made in good faith and it (a) described the declarant's then existing state of mind, emotion or physical sensation, including statements of intent, plan, motive, design, mental feeling, pain and bodily health, but not including memory or belief, to prove the fact remembered or believed, when such a mental or physical condition is in issue or is relevant to prove or explain acts or conduct of the declarant. [Evid.R. 63(12)].
This is particularly true of testimony given by Heath regarding what Pugliese intended and instructed to be done with the funds. Defendant asserted in his defense that the money given to him by Pugliese was meant as a personal loan to be repaid by defendant with interest. Thus, Pugliese's state of mind, in terms of intent, and his directions to defendant were in issue. Clarification of the details which may have supported or detracted from Heath's relatively conclusory testimony was an option available to the defense through more appropriate and specific objection or cross-examination. We cannot say that any hearsay error, if it occurred, created a real possibility of an *250 unjust result or otherwise warrants reversal. See Hightower, supra, 120 N.J. at 410, 577 A.2d 99.

IV.
Defendant asserts that he did not benefit from the transactions that supported his convictions on counts two, five, seven, nine, and eleven and that they must, therefore, be overturned. Because the evidence indicated that all parties were reimbursed for the amounts misapplied by defendant, defendant claims he received no benefit.
The statute regarding misapplication of entrusted property provides:
A person commits a crime if he applies or disposes of property that has been entrusted to him as a fiduciary, or property belonging to or required to be withheld for the benefit of the government or of a financial institution in a manner which he knows is unlawful and involves substantial risk of loss or detriment to the owner of the property or to a person for whose benefit the property was entrusted whether or not the actor has derived a pecuniary benefit. "Fiduciary" includes trustee, guardian, executor, administrator, receiver and any person carrying on fiduciary functions on behalf of a corporation or other organization which is a fiduciary.
If the benefit derived from a violation of this section is $75,000.00 or more, the offender is guilty of a crime of the second degree. If the benefit derived exceeds $1,000.00, but is less than $75,000.00, the offender is guilty of a crime of the third degree. If the benefit derived is $1,000.00, or less, the offender is guilty of a crime of the fourth degree.
For the purposes of this section, the term "benefit derived" shall include but shall not be limited to the amount of the tax avoided, evaded or otherwise unpaid or improperly retained or disposed of. [N.J.S.A. 2C:21-15].
Defendant claims that because there is a grading scheme involved, the Legislature clearly "intended that someone derive some pecuniary benefit for a defendant to be found guilty."
Defendant's arguments are clearly without merit. R. 2:11-3(e)(2). Defendant's position is tantamount to saying that if a victim whose property has been misapplied is eventually made whole, then no conviction may stand because the State no longer can prove that defendant received a benefit. The statute does not support this position. Further, we note that although all three victims here may have been reimbursed, it *251 was not demonstrated that defendant was directly responsible for that reimbursement.
Defendant was a fiduciary with a duty to remit and apply funds in accordance with the conditions of the trust imposed upon him. He was not to commingle a client's funds with his own. Even though defendant asserted that there was never any doubt as to the financial stability of the 401k plan, defendant used the funds to pay the firm's expenses, thereby putting the funds at risk. The statute clearly states that a person commits a crime of this type if there is a substantial risk of loss "whether or not the actor has derived a pecuniary benefit." N.J.S.A. 2C:21-15 (emphasis added). In any event, defendant did benefit. He misapplied the funds to cover his firm's expenses. We also conclude that, under the plain language of the statute, the benefit defendant derived was that of the face amount of the funds used and not merely the value of the use of the funds for the period of time they were inappropriately used. N.J.S.A. 2C:21-15.

V.
Defendant maintains that counts four and five of the indictment should have been dismissed because the statute of limitations ran before the indictment was returned on August 2, 1989. The State argues that because the crimes alleged were not complete until August 13, 1984, the indictment returned on August 2, 1989 was within the applicable statute of limitations period.
Under N.J.S.A. 2C:1-6b(1), a prosecution for a crime must be commenced within five years after the crime is committed. A prosecution is commenced when an indictment is found. N.J.S.A. 2C:1-6d. "An offense is committed either when every element occurs or, if a legislative purpose to prohibit a continuing course of conduct plainly appears, at the time when the course of conduct ... is terminated." N.J.S.A. 2C:1-6c.
*252 Counts four and five of the indictment involved $42,544.20 transferred from Merrill Lynch to defendant from the Karalanian account. The date on which Merrill Lynch issued the check was June 12, 1984. The check was mailed to Equitable's office in Glen Rock. This check was deposited into defendant's personal account on August 13, 1984.
In count four, defendant was charged with theft by failure to make a required disposition. The elements are set forth in N.J.S.A. 2C:20-9.
A person who purposely obtains or retains property upon agreement or subject to a known legal obligation to make specified payment or other disposition, whether from such property or its proceeds or from his own property to be reserved in equivalent amount, is guilty of theft if he deals with the property obtained as his own and fails to make the required payment or disposition.... An officer or employee of the government or of a financial institution is presumed: (a) to know any legal obligation relevant to his criminal liability under this section, and (b) to have dealt with the property as his own if he fails to pay or account upon lawful demand, or if an audit reveals a shortage or falsification of accounts.... [N.J.S.A. 2C:20-9].
In this case, the provisions of the statute dealing with an employee of a financial institution are applicable because defendant was an employee of an insurance company. See N.J.S.A. 2C:20-1c (defining a financial institution as an insurance company or "other organization held out to the public as a place of deposit of funds or medium of savings and collective investment"). In State v. Kelly, 204 N.J. Super. 283, 498 A.2d 784 (App.Div. 1985), certif. denied, 103 N.J. 496, 511 A.2d 669 (1986), defendant was also charged with failure to make required disposition of property received. In order to find a person guilty of this crime, the State is required to prove that the defendant: "1) purposely obtained or retained property upon agreement or subject to a known legal obligation to make specified payment or other disposition, 2) dealt with the property obtained as his own and 3) failed to make the required payment or disposition." Id. 204 N.J. Super. at 287, 498 A.2d 784.
Count five charged defendant with misapplication of property of a financial institution. N.J.S.A. 2C:21-15. Under this statute, *253 a person commits the crime if he 1) applies or disposes of property that has been entrusted to him as a fiduciary, or property of a financial institution, 2) in a manner that he knows was unlawful, and 3) the application or disposition involves a substantial risk of loss or detriment to the owner of the property. Id.
Although defendant had an obligation under his contract with Equitable to remit the money "as soon as possible," we agree with the holding of the trial judge wherein he stated that, "I'm not going to speculate as to [the defendant's] intent from the time he received the check to the time he deposited it and whether his intent was manifested and enforced. And I find this statute did not run." It was on August 13, 1984  the date of deposit  when defendant affirmatively dealt with the property obtained as his own. He should not be allowed to benefit from the delay caused by his failure to remit the funds between the time the funds were received until they were deposited into his account on August 13, 1984.
It is unclear where the funds were between the date they were mailed and the date they were deposited in defendant's account. The action taken by defendant that objectively and clearly demonstrated misapplication of the funds and the resultant substantial risk of loss was the deposit of the funds into his own account on August 13, 1984. Defendant's action on that date constituted evidence of an element of the crime and was the cornerstone of the criminal conduct supporting his conviction. Prosecution prior to that occurrence may have been deemed precipitous.

VI.
Defendant asserts in his final argument that even if the court upholds the jury's verdict, the sentence of three and one-half years parole ineligibility was inappropriate as a matter of law. Defendant maintains that the trial judge only considered one aggravating factor in imposing the sentence  defendant's *254 prior criminal convictions  and failed to take any mitigating factors into consideration. The defendant argues that the trial judge's reasoning does not support the period of parole ineligibility in light of the fact that the presumptive term was imposed.
The State maintains that the sentence was appropriate and that the sentence was "rather lenient," in that defendant was convicted of a total of eleven offenses and was previously convicted of crimes of a similar nature.
Regardless of whether the court is determining the sentence to be imposed or the period of parole ineligibility, it uses the same aggravating and mitigating factors for reaching its decision. State v. Kruse, 105 N.J. 354, 359, 521 A.2d 836 (1987). Although the same factors are considered, the standards vary.
The standard for balancing the factors, however, is different. In determining the appropriate sentence, the court must decide whether there is a preponderance of aggravating or mitigating factors. When determining parole ineligibility, by contrast, the court must be "clearly convinced that the aggravating factors substantially outweigh the mitigating" factors. The different standard reflects the fact that "[p]eriods of parole ineligibility are the exception and not the rule. They are not to be treated as routine or commonplace." [Ibid. (quoting State v. Martelli, 201 N.J. Super. 378, 382-83, 493 A.2d 70 (App.Div. 1985)].
In Kruse, the defendant was sentenced to the presumptive term of fifteen years for first-degree aggravated manslaughter but was given a seven-year period of parole ineligibility. Id. at 358, 521 A.2d 836. Defendant argued that the imposition of the parole ineligibility term was an abuse of discretion because the presumptive sentence had been found appropriate. Id. at 360, 521 A.2d 836. The Court held that in limited situations, "a court may impose a period of parole ineligibility in conjunction with a presumptive sentence." Id. at 361, 521 A.2d 836.
The Court, however, made it clear that imposition of parole ineligibility in conjunction with a presumptive sentence should be rare.

*255 As previously explained, the determination of the term of a sentence and the appropriateness of a period of parole ineligibility involve consideration of the same aggravating and mitigating factors. Hence, we expect it will be a rare case in which the sentencing court imposes a period of parole ineligibility on top of a presumptive sentence. In such a case, as in all cases where it finds parole ineligibility appropriate, the court should state the reasons for the sentence, indicating why it is clearly convinced that the aggravating substantially outweigh the mitigating factors. [Id. at 362, 521 A.2d 836].
In the case before this court, defendant was sentenced to the presumptive term of seven years, but a period of parole ineligibility of three and one-half years was also imposed. Because of the case law which clearly indicates that parole ineligibility should rarely be imposed in conjunction with a presumptive sentence, we have carefully analyzed the trial judge's findings. State v. Towey, 114 N.J. 69, 552 A.2d 994 (1989); State v. Martelli, 201 N.J. Super. 378, 493 A.2d 70 (App.Div. 1985).
In setting forth his reasons for the sentence in the judgment of conviction, Judge Kuechenmeister stated:
Defendant has a record of two prior arrests and one conviction. It should be noted that his prior conviction was for a serious Federal offense, which subjected him to incarceration. The offenses for which defendant was convicted involved some seven counts of theft and breach of trust regarding considerable amounts of money. The money was entrusted to him for specific investments and ended up in his pocket. There is a likelihood of further criminal activity and incarceration is needed as a deterrent. In view of his prior record, the volume of crimes he has just been convicted of and the types of crimes, the likelihood of further criminal activity, the strong need to deter and the lack of any appreciable mitigating circumstances, warrant a mandatory minimum before he is eligible for parole.
Thus, the court found that several aggravating circumstances existed, but that there were no real mitigating factors. The only mitigating factor that defendant clearly points to in his brief is the fact that defendant "compensated each and every alleged victim of his conduct and ensured that they suffered no real financial harm." However, the record indicates that defendant's wife and the Equitable were at least partially responsible for the compensation of the victims. The only mitigating factor advanced by defendant is subject to dispute. On the other hand, there were four aggravating factors which the court set forth with some degree of clarity. N.J.S.A. 2C:44-1a(3), (4), (6), *256 and (9). Even though the imposition of parole ineligibility in conjunction with a presumptive sentence is more of an exception than a rule, we are satisfied that it was proper in these circumstances. N.J.S.A. 2C:43-6b. The imposition of the sentence does not "shock the judicial conscience." State v. Ghertler, 114 N.J. 383, 393, 555 A.2d 553 (1989).
Affirmed.