**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3210-14T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

EUGENE LAVERGNE,

     Defendant-Appellant.

_____

Argued December 21, 2017 – Decided  November 7, 2018

Before Judges Simonelli, Haas, and Gooden Brown.

On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 12-11-1840.

Robert Carter Pierce, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Robert Carter Pierce, on the brief).

Evgeniya Sitnikova, Deputy Attorney General, argued the cause for respondent (Christopher S. Porrino, Attorney General, attorney; Ian C. Kennedy, Deputy Attorney General, of counsel and on the brief).

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

Despite extensive motion practice, both pre- and post-trial, defendant was convicted by a jury of second-degree misapplication of entrusted property, N.J.S.A. 2C:21-15, and fourth-degree contempt, N.J.S.A. 2C:29-9(a), and sentenced to an aggregate term of seven years' imprisonment. The convictions stemmed from defendant, a now disbarred attorney, misappropriating funds entrusted to him as a fiduciary in a probate matter, and failing to comply with court orders directing the distribution of the funds. Specifically, defendant was directed to withhold $200,000 from a $502,193.14 check made payable to defendant's attorney trust account, representing the proceeds of the sale of an estate asset. Instead, defendant misappropriated over $100,000 of those funds.

Defendant now appeals from his convictions and sentence, raising the following arguments for our consideration:

> POINT I: THE TRIAL COURT ERRED BY DENYING [DEFENDANT'S] MOTION FOR A JUDGMENT OF ACQUITTAL BECAUSE (A) THE EVIDENCE PRESENTED BY THE STATE WAS INSUFFICIENT TO WARRANT A CONVICTION AND, IN THE ALTERNATIVE, (B) THE AMOUNT ALLEGEDLY DIVERTED WAS LESS [THAN] $75,000, WHICH WOULD REDUCE THE CHARGE TO THIRD DEGREE MISAPPLICATION OF ENTRUSTED PROPERTY.[1]

---

[1] We have condensed Point I for clarity.

A-3210-14T2

POINT II: THE TRIAL COURT DEPRIVED [DEFENDANT] OF HIS SIXTH AMENDMENT RIGHT TO CONFRONTATION BY TAKING JUDICIAL NOTICE OF JUDGE KILGALLEN'S OCTOBER 6, 2010 AND JUDGE CAVANAGH'S NOVEMBER 4, 2010 ORDER AND ADMITTING THE ORDERS IN EVIDENCE.

POINT III: THE TRIAL COURT ERRED BY DENYING [DEFENDANT'S] MOTION TO DISMISS THE INDICTMENT BECAUSE THE MONMOUTH COUNTY GRAND JURY DID NOT HAVE JURISDICTION TO HEAR THE CASE AND RETURN AN INDICTMENT AGAINST [DEFENDANT].

POINT IV: THE PROSECUTOR'S SUMMATION WAS FILLED WITH IMPROPER REMARKS THAT DEPRIVED [DEFENDANT] OF A FAIR TRIAL. (NOT RAISED BELOW)[.]

POINT V: THE TRIAL COURT ERRED BY IMPROPERLY INSTRUCTING THE JURY THAT THE STATE "ASSERTS THE DEFENDANT'S RESPONSIBILITY WAS AS A FIDUCIARY FOR THE ESTATE OF FOWLER," WHEN THE INDICTMENT CHARGED HIM WITH BEING A FIDUCIARY TO RICHARD AND MARY BETH GREENHALGH.

POINT VI: THE TRIAL COURT ERRED BY FAILING TO INSTRUCT THE JURY, SUA SPONTE, THAT "IT MAY, BUT IS NOT REQUIRED TO, ACCEPT AS ESTABLISHED ANY FACT WHICH HAS BEEN JUDICIALLY NOTICED." (NOT RAISED BELOW)[.]

POINT VII: THE SENTENCE IMPOSED UPON [DEFENDANT] WAS MANIFESTLY EXCESSIVE.

After considering the arguments presented in light of the record and applicable law, we affirm.

I.

We glean the following facts from the trial record, which consisted of numerous documentary exhibits as well as testimony of five State witnesses, a settlement agent for a title insurance company, a partner in a law firm, a clerk from the Monmouth County Surrogate's Office, and two members of the Monmouth County Prosecutor's Office. Defendant neither produced any witnesses nor testified on his own behalf.

On July 6, 2009, Judge Thomas W. Cavanagh, Jr., entered an order approving the sale for $800,000 of the Avon Marina, a waterfront property located in Avon-by-the-Sea. The seller of the property was the Estate of James Fowler (Estate). The Estate was involved in litigation, and defendant was the attorney for the Estate.

In a second July 6, 2009 order prepared by defendant, Judge Cavanagh appointed Connie Fowler-Minck as the permanent Substituted Administrator, C.T.A. of the Last Will and Testament of James Fowler and as the Substituted

Trustee of the Trust of James Fowler, replacing Mary Beth Greenhalgh.[2] The second July 2009 order also directed "the moving party" to "escrow the sum of $400,000 from the closing" of the Avon Marina "to pay claims" against the Estate "by the former co-executrix," Mary Beth Greenhalgh, and the former Estate attorney, her father, Richard Greenhalgh. The order also specified that "[t]he money will not be disbursed [with]out another order from the [c]ourt."[3]

The closing occurred the following day on July 7, 2009. The net proceeds due to the Estate from the $800,000 sale price was $502,193.14, after deductions for mortgage payoff, tax adjustments, and liens. During the closing, the title agency issued two checks to defendant. One check for $502,193.14 was payable to defendant's attorney trust account, and the other check for $25,000 was payable to defendant as compensation for his legal services.

On August 28, 2009, after Richard Greenhalgh filed a motion for attorney fees, Judge Cavanagh entered another order scheduling a plenary hearing for the counsel fee application, and directing Mary Beth Greenhalgh to file a formal claim for commissions, attorney fees, and costs, pursuant to N.J.S.A. 3B:14-24

---

[2] In an order dated August 22, 2008, the court had removed Mary Beth Greenhalgh and appointed Connie Fowler-Minck on an interim basis. The July 6, 2009 order made that appointment permanent.

[3] These two latter directives were handwritten on the order by Judge Cavanagh.

and Rule 4:24-2. The August 2009 order also stated that "[t]he amount being held in Escrow by the attorneys for the Substitute Administrator C.T.A. of the Estate . . . may be reduced to $200,000 with the consent of all interested parties."

On May 13, 2010, Judge Cavanagh entered two companion orders. In one order, Judge Cavanagh awarded Richard Greenhalgh $112,374.44 from the Estate, representing attorney fees and reimbursements for payments made on behalf of the Estate. In the other order, Judge Cavanagh awarded Mary Beth Greenhalgh $17,000 from the Estate, representing commission and costs. When the Estate failed to comply with the May 2010 orders by failing to pay the awards to the Greenhalghs, on August 11, 2010, Parsons and Nardelli, attorneys for the Greenhalghs, filed a motion to enforce litigant's rights under Rule 1:10-3 to compel payment of the awards as directed in the May 2010 orders.

As a result, on September 3, 2010, Judge Cavanagh ordered defendant, "as attorney for the Estate" and "escrow agent," to "pay[,] out of the $200,000 escrow he [was] holding[,] a check to . . . Mary Beth Greenhalgh in the amount of $17,000 and [a check] to . . . Richard B. Greenhalgh" in the amount of $111,928.94.[4] The order also directed defendant to pay Parsons and Nardelli

_____

[4] There was a slight difference in the amounts to be paid to Richard Greenhalgh between the May and the September 2010 orders, apparently due to a reduction in Greenhalgh's counsel fees.

$3,840 from the escrow account for counsel fees. With interest, the total judgment against the Estate increased to $132,968.94, and, pursuant to the September 3, 2010 order, "all payments" were to be made by defendant "within [ten] days of th[e] order," or the Greenhalghs "may seek relief under [Rule] 1:10-3, to accomplish same." Defendant did not appear at the September 3, 2010 hearing.

At some point, James Nardelli, a partner in Parsons and Nardelli, "became fearful that the money that should have been in the escrow account was not there." Thus, in order "to confirm that there was, in fact, $200,000 to secure the judgment in favor of [their] client[s,]" the firm issued "a subpoena [to TD Bank] for [defendant's] trust account records." Upon receipt of the records, Nardelli learned that the current balance in the account was "approximately $91,000." Nardelli noted "that there were a series of . . . withdrawals" for $500 and $1000 in "cash or checks payable to cash," which "was highly unusual" for an attorney trust account. According to Nardelli, in his twenty years of "managing [his] trust account," he had never made "a cash disbursement" because "[y]ou need to have a record of what you do with your clients' funds."

After receiving defendant's bank records, Nardelli promptly "prepared an order to show cause . . . asking the [c]ourt to immediately restrain any further

disbursements from [defendant]'s account and to order that those funds be transferred to . . . [Nardelli's] firm's trust account for the benefit of [the Greenhalghs]." In an order entered on October 6, 2010, Judge Honora O'Brien Kilgallen granted the application, and "restrained" defendant "from making any disbursements, distributions, withdrawals[,] or payments of any kind whatsoever from his attorney trust account maintained at TD Bank . . . until further [o]rder of this [c]ourt." Further, the order "[d]irected" TD Bank "to pay all amounts contained in [defendant's] attorney trust account" to "Parsons and Nardelli Attorney Trust Account" within "[forty-eight] hours . . . to be held in escrow . . . until further [o]rder of this [c]ourt." Additionally, defendant was ordered to appear on October 15, 2010, to "show cause why the temporary relief provided . . . should not be continued and made permanent."

On the October 15, 2010 return date for the order to show cause, defendant failed to appear. However, on October 14, 2010, defendant submitted a certification in opposition to the motion and a request for an adjournment, which was denied. In the certification, defendant conceded "that he was to retain an amount of funds 'sufficient to cover any attorneys fees.'" However, according to the certification, "his client [Connie Fowler-Minck] 'authorized' him to reduce the amount of monies he was holding in escrow, and . . . accepted the

responsibility to replenish the funds or pay any overage in the event they exceeded the required amount." The certification further explained "that the monies in the account now with Mr. Parsons, belong[ed] to the Estate and the balance of monies [were] in the possession of Connie Fowler[-]Minck," who was "still in possession of 'several hundred thousands of dollars for the sale of the Marina property.'" Defendant concluded the certification by indicating that he was "'at odds' with his client and 'seeking advice of counsel as to what to do under the circumstances.'"

After conducting the scheduled proceeding on October 15, 2010, on November 4, 2010, Judge Cavanagh entered a memorializing order. In the November 4, 2010 order, after recounting at length the history of the litigation, the prior orders entered, none of which were challenged in court, defendant's non-compliance, and the content of defendant's certification submitted in opposition,[5] Judge Cavanagh ordered defendant and Connie Fowler-Minck to appear on November 19, 2010, "to address the . . . issues." Once again, on November 19, 2010, defendant failed to appear.

---

[5] The November 4, 2010 order also recounted the certification submitted by Theodore D. Parsons, Jr., a partner in Parsons and Nardelli, in support of the application. Parsons passed away prior to the trial. However, his partner, Nardelli, testified at the trial about the firm's involvement in the probate litigation.

Teri Blesch, a financial analyst with the Monmouth County Prosecutor's Office, analyzed defendant's attorney trust account bank records subpoenaed from TD Bank. She testified that on July 6, 2009, the day before the closing of the Avon Marina, defendant's trust account balance was $5.74. However, on July 8, 2009, the day after the closing, two checks were deposited into the account from Land Title Services Agency, one for $502,193.14, and the other for $25,000.

From July 15, 2009, to September 13, 2010, defendant made several withdrawals from the account, including a wire transfer for approximately $200,000 on or about September 4, 2009, which corresponded with the court's August 28, 2009 order authorizing the reduction of the escrow amount to $200,000. After the wire transfer, the account balance was reduced to $202,271.31. In addition to the wire transfer, from July 9, 2009, to September 8, 2010, there were 130 cash withdrawals from the account and two checks defendant wrote to himself, all totaling $103,120.50. On May 13, 2010, when the court awarded the fees and costs to the Greenhalghs, the balance in the account was $107,096.54. On September 13, 2010, the deadline imposed by the court for defendant to pay the total judgment against the Estate of $132,968.94, the balance in the account was $91,555.79.

On November 14, 2012, defendant was indicted by a Monmouth County grand jury. Count one of the two-count indictment alleged that

> between July 6, 2009[,] through November 19, 2010, . . . [defendant] did commit the crime of [m]isapplication of [e]ntrusted [p]roperty, by purposely or knowingly applying or disposing of property that was entrusted to him as a fiduciary, to wit: money, valued at $75,000 or more, belonging to individuals designated by [Judge Cavanagh], "In the Matter of the Estate of James Fowler, Deceased" upon agreement, in a manner which he knew was unlawful or involved substantial risk of loss or detriment to the owner[] . . . .

Count two of the indictment alleged that

> between July 6, 2009[,] through November 19, 2010, . . . [defendant] did commit the crime of [c]ontempt, by purposely or knowingly disobeying a judicial order[], to wit: orders entered by [Judge Cavanagh], In the Matter of the Estate of James Fowler, Deceased, . . . which were filed on August 28, 2009[,] and/or May 13, 2010[,] and/or September 3, 2010, or by hindering, obstructing or impeding the effectuation of said order[] . . . .

Following the jury verdict, on December 19, 2014, the trial court sentenced defendant to a seven-year term of imprisonment on the misapplication of entrusted property charge and a concurrent eighteen-month term on the contempt charge.[6] This appeal followed.

---

[6] On January 14, 2015, defendant was granted bail pending appeal by the trial court.

II.

Defendant's argument in Point I attacks the sufficiency of the State's proofs. Defendant asserts the "court was required to grant [his] motion for judgment of acquittal because the State failed to present any evidence that . . . [he] was 'knowingly' the escrow agent for the Greenhalgh[s,] . . . that he 'knowingly' diverted these funds for his personal use," or "that the 'benefit derived' to [defendant] was greater than $75,000." Having set forth in detail the facts established by the State at trial, upon which the jury could have based its verdict, and having carefully reviewed defendant's argument in light of the record and applicable law, we conclude that the argument has insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Suffice it to say that defendant's motion for judgment of acquittal pursuant to Rule 3:18-1 was properly denied under the standard set forth in State v. Reyes, 50 N.J. 454, 458-59 (1967), which we review de novo. State v. Dekowski, 218 N.J. 596, 608 (2014). There was adequate proof that defendant

> dispose[d] of property that [had] been entrusted to him as a fiduciary . . . in a manner which he [knew was] unlawful and involve[d] substantial risk of loss . . . to the owner of the property or to a person for whose benefit the property was entrusted whether or not [defendant] . . . derived a pecuniary benefit.
>
> [N.J.S.A. 2C:21-15.]

12

Further, the State presented sufficient evidence that the "benefit derived" exceeded $75,000 to support a second-degree conviction. Ibid. The definition of "'benefit derived' includes the value of all funds or property misapplied by defendant." Model Jury Charge (Criminal), "Misapplication of Entrusted Property" (approved June 6, 2008); see also State v. Modell, 260 N.J. Super. 227, 251 (App. Div. 1992) (concluding "that, under the plain language of the statute, the benefit defendant derived was that of the face amount of the funds used and not merely the value of the use of the funds for the period of time they were inappropriately used"). Similarly, the State presented sufficient evidence that defendant "purposely or knowingly disobey[ed] a judicial order" to support a contempt conviction. N.J.S.A. 2C:29-9(a).

### III.

In Point II, defendant argues that by taking "judicial notice of Judge Cavanagh's November 4, 2010 order, which was dispositive on the issue of whether [defendant] or the Estate was to escrow the funds," the court "deprived [defendant] of his Sixth Amendment right to confront his accusers." For the same reason, defendant also argues that the court erred by "taking judicial notice" of "Judge Kilgallen's October 6, 2010 order." Defendant did not object to the admission of any of the other orders.

13

Pre-trial, the State subpoenaed Judges Cavanagh and Kilgallen to testify, and the Attorney General, representing the judges, moved to quash the subpoenas. Following oral argument, the court quashed the subpoenas, ruling that "everything" the judges would testify to "[was] reflected in the record," which "[was] available to both parties." Thereafter, defendant objected to the admission of Judge Kilgallen's October 6, 2010, and Judge Cavanagh's November 4, 2010 orders. Relying on State v. Silva, 394 N.J. Super. 270 (App. Div. 2007), defendant argued that the orders were hearsay and their admission violated his Sixth Amendment right to confrontation. Defendant also asserted that portions of the orders were cumulative, "prejudicial" to defendant, and not "relevant to the State's proofs."

The court overruled defendant's hearsay objection, determining that the court could take judicial notice of the orders pursuant to N.J.R.E. 201, but "limit it to the [c]ourt orders," rather than any discussions contained therein. In order to meet the State's needs to "set[] forth" the court orders "with some specificity," as well as "defendant's needs not to have hearsay or opinions before the jury that are not subject to appropriate examination," the court agreed "to admit factual statements or orders" contained in the court orders but not "opinions of the [c]ourt or . . . anyone else." According to the court,

14

[t]he ultimate determination of whether the order was violated is a decision for the jury to make and for [defense counsel] to argue to them, but the existence of the order and the fact that it is a legitimate . . . order is one that has to be argued by the State[] . . . .

In response to defendant's objection that he was being deprived of the opportunity to elicit "exculpatory information" from the judge on cross-examination, the court responded that if defendant "subpoena[ed] the [j]udge for [his] case, [his] interests might be different [than] the State's interests" and the court "would certainly reconsider" its decision to quash the subpoena. The court also rejected defendant's argument that the November 4, 2010 order was cumulative or unduly prejudicial, explaining that

a summary as set forth by a judge in an order is perfectly permitted and is an understandable vehicle for a jury to understand the context of the history of the orders and to understand the context of the [c]ourt's prior orders and subsequent orders and to make an honest, fair determination as to whether the order was violated by [defendant.]

Further, to avoid "undue prejudice," the court ordered the redaction of portions of the November 4, 2010 order, including the directive that defendant's failure to appear at a future date would result in the court issuing a warrant for his arrest to compel his appearance. Additionally, the court accepted the State's concession that the recitation of the contents of both Parsons' and defendant's

15

certifications in the November 4, 2010 order would not "be offered for the truth of the matter stated," but "to show the conduct and the chronology." Defendant neither sought to have the court reconsider its decision quashing the State's subpoena, nor sought to call the judges as witnesses.

N.J.R.E. 201(b) provides that "[f]acts which may be judicially noticed include":

> (1)   such specific facts and propositions of generalized knowledge as are so universally known that they cannot reasonably be the subject of dispute,
>
> (2)   such facts as are so generally known or are of such common notoriety within the area pertinent to the event that they cannot reasonably be the subject of dispute,
>
> (3) specific facts and propositions of generalized knowledge which are capable of immediate determination by resort to sources whose accuracy cannot reasonably be questioned, and
>
> (4)   records of the court in which the action is pending and of any other court of this state or federal court sitting for this state.

Although N.J.R.E. 201(b)(1)-(3) "all require that[,] to be judicially noticed[,] the facts cannot reasonably be questioned or disputed," N.J.R.E. 201(b)(4) "contains no restriction limiting its application to facts that cannot reasonably be disputed or questioned." Silva, 394 N.J. Super. at 273-74. "In determining the propriety of taking judicial notice of a matter," the "rules of

A-3210-14T2

evidence shall not apply except [N.J.R.E.] 403 or a valid claim of privilege."

N.J.R.E. 201(f).

"The purpose of judicial notice is to save time and promote judicial economy by precluding the necessity of proving facts that cannot seriously be disputed and are either generally or universally known." Silva, 394 N.J. Super. at 275 (citing RWB Newton Assocs. v. Gunn, 224 N.J. Super. 704, 711 (App. Div. 1988)). However, judicial notice cannot be used "to circumvent the rule against hearsay and thereby deprive a party of the right of cross-examination on a contested material issue of fact." RWB, 224 N.J. Super. at 711 (citing People v. Rubio, 139 Cal. Rptr. 750, 755-56 (Cal. Ct. App. 1977)). "[T]he doctrine also cannot be used to take notice of the ultimate legal issue in dispute." Silva, 394 N.J. Super. at 275 (citing A&B Auto Stores of Jones St., Inc. v. City of Newark, 103 N.J. Super. 559, 567 (Law Div. 1968)).

In Silva, we stated,

> a distinction must be drawn between taking judicial notice that a judge decided a case in [a] particular way or made a particular finding in favor of one of the parties and taking judicial notice that the judge's findings of fact must necessarily be true. Or stated slightly differently, there is a significant distinction between noticing that a judge ruled in favor of one of the parties and noticing that that party's testimony must have been truthful.

[Id. at 277-78 (citing Sosinsky v. Grant, 8 Cal. Rptr. 2d 552, 562 (Cal. Ct. App. 1992)).]

There, in a criminal prosecution for burglary, aggravated assault and contempt, the trial court took judicial notice of another judge's factual finding in a related domestic violence proceeding, in which the judge denied a final restraining order, "finding that it would have been 'impossible' for [the] defendant to have committed the assault alleged by the victim" because he could not have been at the scene. Id. at 272. We concluded that the specific findings of a domestic violence judge were not a proper subject for judicial notice because "the domestic violence judge's findings were based upon evidence that was vigorously contested in that proceeding at that time," "there [was] no guarantee that they [were] in fact true," "the findings [could not] be immediately verified through any source whose accuracy [could not] reasonably be questioned," and "the fact findings deal[t] with one of the ultimate questions confronting the criminal jury, whether defendant committed the assault in question." Id. at 278.

Similarly, in RWB, the trial court intended to take judicial notice of the content of certifications filed in another case solely because they were included in the court record and without regard to the fact that the certifications were hearsay. 224 N.J. Super. at 710. As we explained in that case, "[a] court may

18

take judicial notice that a certification has been filed. In addition, a court can take notice of what is alleged in a certification, if the fact that the allegation has been made is itself relevant." Id. at 710-11. However, "a court may not take judicial notice of the contents of a certification for the purpose of determining the truth of what it asserts simply because the certification has been filed with a court and thus is part of a court record." Id. at 711.

Here, we conclude that the October 6 and November 4, 2010 orders were a proper subject for judicial notice, and we are satisfied that the court's evidentiary ruling, to which we owe deference, State v. Nantambu, 221 N.J. 390, 402 (2015), was not "'so wide of the mark' as to result in a manifest injustice." State v. J.D., 211 N.J. 344, 354 (2012) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). The orders were based upon facts, rather than opinions, were verified by other undisputed evidence in the record, and were redacted in parts as required under N.J.R.E. 403, where the risk of undue prejudice substantially outweighed the probative value. Further, although the orders directed defendant to take certain actions, they never addressed defendant's intent or the circumstances of his non-compliance, and the content of the certifications

referenced in the November 4, 2010 order were not admitted for the truth of the matter asserted.[7]

Even if the judge erred in taking judicial notice of the orders, the orders were admissible under the public records exception to the hearsay rule, which permits the introduction of

> a statement contained in a writing made by a public official of an act done by the official or an act, condition, or event observed by the official if it was within the scope of the official's duty either to perform the act reported or to observe the act, condition, or event reported and to make the written statement.
>
> [N.J.R.E. 803(c)(8)(A).]

We also reject defendant's argument that the "court's ruling admitting the orders in evidence deprived [him] of his Sixth Amendment right to confront witnesses." The principles embodied in the Sixth Amendment's Confrontation Clause preclude the admission against a defendant of "[t]estimonial statements of witnesses absent from trial," unless "the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." Crawford v. Washington, 541 U.S. 36, 59 (2004). Thus, the threshold issue implicating

---

[7] We note that defendant's certification was admissible as a statement by a party opponent. See N.J.R.E. 803(b)(1).

the right of confrontation is whether the statement admitted against the defendant was "testimonial."

"A statement is 'testimonial' if its 'primary purpose' [is] 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution.'" State v. Bass, 224 N.J. 285, 314 (2016) (alterations in original) (quoting Bullcoming v. New Mexico, 564 U.S. 647, 659 n.6 (2011)). In other words, to be testimonial, the statement must be made with the "primary purpose of creating an out-of-court substitute for trial testimony." Ohio v. Clark, 576 U.S. __, 135 S. Ct. 2173, 2180 (2015). In making that determination, although the surrounding circumstances are relevant, it is the statement's primary purpose, viewed objectively, that must be ascertained. Michigan v. Bryant, 562 U.S. 344, 359 (2011).

"[A] statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial," and "[w]here no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." Clark, 135 S. Ct. at 2180 (quoting Bryant, 562 U.S. at 359). Thus, "business and public records 'are generally admissible absent confrontation . . . because--having been created for the administration of an entity's affairs and not for the purpose of establishing or

proving some fact at trial--they are not testimonial.'" Bullcoming, 564 U.S. at 659 n.6 (alteration in original) (quoting Melendez-Diaz v. Massachusetts, 557 U.S. 305, 324 (2009)).

IV.

In Point III, defendant argues that because Monmouth County Assignment Judge Lawrence M. Lawson recused himself from matters involving defendant as a result of defendant filing a complaint against the judge, "[t]he indictment returned against [defendant] is void ab initio" based on Judge Lawson's "conflict of interest." Thus, defendant argues the "court erred by not dismissing the indictment." We disagree.

Pre-indictment, defendant filed a motion to compel Judge Lawson to recuse himself from all matters involving defendant, and to transfer all matters regarding defendant to another county, including the grand jury presentation, due to a conflict of interest and the appearance of impropriety. Defendant asserted recusal was warranted because, between 1993 and 1995, he had sued and settled a federal lawsuit against Judge Lawson and the judiciary involving the employment rights of certain judiciary employees. On July 10, 2012, following oral argument, Judge Thomas F. Scully determined that "Judge Lawson [was] not overseeing the [g]rand [j]ury as it relate[d] to this matter in

22

any way, shape[,] or form," and "has taken . . . measures to assure that that would not occur well in advance of today's proceeding."

The judge explained:

> Prior to the commencement of this proceeding, [Judge Lawson] had assigned to [Judge Scully,] the Presiding Judge of the Criminal Division, . . . the obligation to resolve all questions and all issues associated with the presentation of this matter to the [g]rand [j]ury. Judge Lawson assigned this role pursuant to the applicable Court Rules to address all issues and question[s] relating to this defendant's [g]rand [j]ury presentment.
>
> Nothing that has occurred with respect to the selection, the empaneling, the resolution of any issues regarding this [g]rand [j]ury has addressed specifically the facts of this case. The [g]rand [j]ury selection process, the empaneling process is not case specific, [and] does not advise [g]rand [j]urors . . . the cases they will be hearing.
>
> Judge Lawson accordingly has at no time addressed this matter with any specificity and has, in fact, . . . removed himself from any direct or indirect[] oversight of this matter to the [g]rand [j]ury.

Judge Scully also denied defendant's request to transfer the case to another county, rejecting defendant's distrust of "any Monmouth County Judge[]" and assertion that "when . . . matters involved local attorneys," such transfers "were routine." The judge noted that defendant provided "no . . . support in law, or in fact," for his application.

After the indictment was returned and the case assigned to Judge Ronald Lee Reisner for resolution, defendant filed another motion to transfer the case to another county, and to compel Judge Reisner to recuse himself, based on alleged animus directed at defendant by the judge arising from their involvement in litigation while the judge was in private practice. Although the judge determined there was "no basis" for him to disqualify himself, on April 5, 2013, prior to defendant being arraigned, Judge Reisner transferred the case to Middlesex County. The judge reasoned that given the fact that defendant had "practiced . . . for a number of years" and was "well known in [Monmouth] county," as well as the "publicity" generated by the prosecution, a transfer was warranted under the circumstances to ensure "a fair trial by fair and impartial jurors."

After the case was transferred to Middlesex County, defendant moved to dismiss the indictment based on Judge Lawson's involvement in the grand jury process after his recusal. On June 25, 2014, following oral argument, Judge Bradley J. Ferencz denied the motion.[8] The judge rejected defendant's reliance on In re Newman, 189 N.J. 477 (2006), in which a municipal court judge,

---

[8] We denied defendant's interlocutory appeal on August 28, 2014, and the Supreme Court denied defendant's motion for leave to appeal on November 21, 2014.

motivated by a desire to spare the defendant from having to return to court and appear before a different judge, was disciplined for conducting an arraignment of a defendant notwithstanding the existence of an acknowledged conflict of interest. Judge Ferencz explained that while supervision of a grand jury "is necessary to ensure [its] independence[,] . . . '[n]o judge presides to monitor its proceedings,'" quoting State v. Murphy, 213 N.J. Super. 404, 411 (App. Div. 1986), aff'd, 110 N.J. 20 (1988). Instead, according to the judge, the supervisory role of the Assignment Judge includes only "summoning . . . the grand jury," "charging the grand jury," "administering the oath," and "discharging the grand jury at the end of their term."

Judge Ferencz acknowledged that a "[d]efendant charged with an indictment is entitled to [an] unbiased grand jury," and determined that "in this case, there[] [was] no evidence that [defendant] did not get one." The judge continued:

> In fact, all parties agree . . . that it was not the functioning of the grand jury, or the charge of the grand jury, or the evidence presented before the grand jury, but the fact that Judge Lawson empaneled the grand jury that gives rise to the claim that he had no jurisdiction and the [claim of] bias and/or prejudice.

However, according to Judge Ferencz, "the grand jury process went . . . without a hitch, without incident, and without any questions of the grand jurors that necessitated any judicial involvement whatsoever."

Next, the judge addressed defendant's argument that given Judge Lawson's recusal, his empaneling the grand jury "was a direct violation of [Rule 1:12-3(a)],"[9] which vitiated "every aspect of the case." Initially, the judge noted that

> this rule says any matter pending before the court. There was, at the time of this grand jury empanelment, no matter pending before the court. The matter had not yet been presented to the grand jury. And while everyone seem[ed] to be in agreement that the case would be presented to . . . one of these two grand juries, that was left in the hands of [the] Monmouth County [P]rosecutor's [O]ffice. And should they have chosen not to present it, or delay the presentation, Judge Lawson, and in fact the entire Monmouth County judiciary would have had no sway, impact, or influence over that decision.

---

[9] Rule 1:12-3(a) provides in pertinent part that

> [i]n the event of the disqualification or inability for any reason of a judge to hear any pending matter before or after trial, another judge of the court in which the matter is pending or a judge temporarily assigned to hear the matter shall be designated by the Chief Justice or by the Assignment Judge of the county where the matter is pending . . . .

In fact, the judge pointed out that grand jury proceedings "are secret" and "are known to the court only upon return and submission to the court of whatever the grand jury returns[,] . . . no bill or true bill." See R. 3:6-8.

Judge Ferencz further explained:

> Defendant mischaracterizes the fact by stating that Judge Lawson empaneled the grand juries to hear the defendant's case. This was not an investigatory grand jury which is empaneled for the purposes of investigating a case. It was a standard . . . grand jury empanelment to sit [eighteen] weeks . . . , [one] day a week, and to get everything from drug cases, to homicides, to bad checks, to apparently [defendant's] matter.
>
> . . . .
>
> It is a simple fact that Judge Lawson had no direct contact with defendant's case. And his role in swearing in a jury and using standard language and form promulgated from the conference of Assignment Judges had absolutely no prejudicial affect, nor any affect whatsoever on this defendant. And no rational person would conceive that there's even an appearance of impropriety.

Finally, in rejecting defendant's argument that "recusal mean[t] a conflict of interest was found" and prejudice was "presumed," Judge Ferencz stated that defendant "fail[ed] to acknowledge that Judge [Lawson] recused . . . himself from hearing any matters specific to the defendant. He did not recuse himself from empaneling any and all grand juries in Monmouth County." However,

27

according to the judge, "any conflict that could have occurred" in connection with the grand jury presentation of defendant's case "went to Judge Scully." Judge Ferencz concluded:

> It is clear that Judge [Lawson] did what [was] appropriate. [Defendant's] name [was] never mentioned. . . . There simply [was] no contact, direct or even inferentially, with defendant's case.
>
> There is a clear line drawn between a grand jury and [the] judiciary. And that line clearly separates any direct contact, administerial or otherwise, with Judge Lawson and this defendant.

Following the jury verdict, defendant moved for reconsideration, arguing "that there was involvement of Judge Lawson in the case that [they] were[] [not] aware of . . . when [Judge Ferencz] ruled on the motion." Specifically, defendant asserted that on July 9, 2012, during the grand jury presentation, the prosecutor presented Judge Lawson with a grand juror's request to be excused because of financial hardship, which Judge Lawson granted after questioning the juror. Defendant asserted that his effort to obtain the voir dire transcript earlier was further thwarted by Judge Lawson's involvement. Defendant argued that these "particular factors justif[ied] the [c]ourt finding that Judge Lawson did, in fact, exert jurisdiction," which was prohibited given his recusal, and, by extension, voided all subsequent action in this case.

Following oral argument, on December 19, 2014, Judge Ferencz denied the motion. The judge explained that "there should be at least some perceived prejudice[,] [a]nd, having counted the votes," the judge concluded the excused juror "was certainly a non-issue when it came to the ultimate decision as to whether to indict." The judge rejected defendant's argument that "the rules . . . wrest[] jurisdiction from this [c]ourt years after a non-prejudicial decision was made." The judge posited:

> The issue, simply put, is, having recused himself from the case and sent it elsewhere, does that mean he's not permitted to hear other things coming from the grand jury that have nothing to do with [defendant's] case? Does it mean he abrogates all responsibilities . . . in his role as assignment judge? And I think the answer is just simply patently no.

On appeal, defendant argues that because Judge Lawson recused himself, "[Rule] 1:12-3 required him, as assignment judge, to relinquish jurisdiction of the matter to the Chief Justice, who would have assigned an unbiased court to preside over" the proceedings. However, "[i]nstead of relinquishing authority of [defendant's] matter to the Chief Justice prior to the impaneling of [defendant's] grand juries," Judge Lawson "presided over the grand jury proceedings[,] assigning Judge Scully to answer any questions presented by the grand jury during the presentment and then, after [defendant] was indicted,

assign[ing] the matter to Judge Reisner . . . for resolution." Defendant urges the remedy for Judge Lawson's transgression is dismissal of the indictment.

"[T]he bedrock principle articulated in Canon 1 of the Code of Judicial Conduct [is] that '[a]n independent and honorable judiciary is indispensable to justice in our society.'" DeNike v. Cupo, 196 N.J. 502, 514 (2008) (third alteration in original). "To that end, judges are required to maintain, enforce, and observe high standards of conduct so that the integrity and independence of the judiciary may be preserved." Ibid. (internal quotation marks omitted). "Judges are to act at all times in a manner that promotes public confidence, and must avoid all impropriety and appearance of impropriety." Ibid. (emphasis and internal quotation marks omitted).

"'[I]t is not necessary to prove actual prejudice on the part of the court' to establish an appearance of impropriety; an 'objectively reasonable' belief that the proceedings were unfair is sufficient." Id. at 517 (quoting State v. Marshall, 148 N.J. 89, 279 (1997)). "That standard requires judges to 'refrain . . . from sitting in any causes where their objectivity and impartiality may fairly be brought into question.'" Id. at 514 (quoting State v. Deutsch, 34 N.J. 190, 206 (1961)). "In other words, judges must avoid acting in a biased way or in a manner that may be perceived as partial. To demand any less would invite

30

questions about the impartiality of the justice system and thereby 'threaten[] the integrity of our judicial process.'" Id. at 514 (alteration in original) (emphasis omitted) (quoting State v. Tucker, 264 N.J. Super. 549, 554 (App. Div. 1993)). Nonetheless, a judge's involvement in "purely ministerial" and "[in]substantial" acts "that do[] not involve the exercise of discretion," may not raise the same concerns. Id. at 515.

Here, defendant offers no support for his proposition that Rule 1:12-3 prohibited Judge Lawson from empaneling a grand jury or assigning other judges to handle defendant's case, including the grand jury presentation. By its plain language, Rule 1:12-3(a) requires the assignment judge or the Chief Justice to designate another judge "to hear any pending matter before or after trial" if the judge hearing the matter is disqualified. Nor is there any support for defendant's proposition that where the case is ultimately transferred to a different county after indictment, but prior to arraignment, a conflict by Judge Lawson creates a jurisdictional issue mandating the dismissal of the indictment in the absence of any finding of prejudice, perceived or actual, in the grand jury presentation. On the contrary, we are satisfied that Judge Lawson's ministerial and insubstantial acts "did not 'substantially undermine' the objectivity of the charging process or cause harm to the defendant." Murphy, 110 N.J. at 35.

Even "in the case of 'any error in the grand jury proceeding connected with the charging decision,' the United States Supreme Court [has] held that a guilty verdict 'rendered harmless' any such error." State v. Lee, 211 N.J. Super. 590, 599 (App. Div. 1986) (quoting United States v. Mechanik, 475 U.S. 66, 70 (1986)). Further, "[p]rocedural irregularities in a grand jury proceeding are rendered harmless where defendant is ultimately found guilty by petit jury." State v. Warmbrun, 277 N.J. Super. 51, 60 (App. Div. 1994) (quoting State v. Ball, 268 N.J. Super. 72, 120 (App. Div. 1993), aff'd, 141 N.J. 142 (1995)).

## V.

In Point IV, defendant argues that "[t]he prosecutor made numerous remarks during his summation that were not supported by any evidence adduced at trial, were inflammatory[,] and constitute plain error." Specifically, defendant asserts that the prosecutor, without any witness testimony or supporting evidence, stated or argued in summation that: (1) "[defendant's] defense was 'absurd'" and Judge Cavanagh "might not be presiding Chancery judge for very long" if he "generate[d] an order" for Fowler-Minck to escrow the money in her account; (2) "Judge Cavanagh ordered the money to be escrowed with [defendant] because 'he trusted that it would be safe there' and that 'Judge Cavanagh trusted him to do the right thing'"; (3) "'Judge Kilgallen told

[defendant] over the phone' to appear at the October 15, 2010 hearing"; (4) "everyone in the underlying chancery litigation knew that [defendant] was the escrow agent"; and (5) "[defendant] was a 'fiduciary for the estate money of the Estate of James Fowler.'"

"Because [defendant] failed to object at trial, we review the challenged comments for plain error." State v. Pressley, 232 N.J. 587, 593 (2018). "[W]hen counsel does not make a timely objection at trial, it is a sign 'that defense counsel did not believe the remarks were prejudicial . . . .'" Id. at 594 (quoting State v. Echols, 199 N.J. 344, 360 (2009)). Thus, "[d]efendant's lack of objections . . . weighs against defendant's claim that errors were 'clear' or 'obvious.' Indeed, '[i]t [is] fair to infer from the failure to object below that in the context of the trial the error was actually of no moment.'" State v. Nelson, 173 N.J. 417, 471 (2002) (second and third alterations in original) (quoting State v. Macon, 57 N.J. 325, 333 (1971)). "The failure to object also deprives the court of an opportunity to take curative action." State v. Frost, 158 N.J. 76, 84 (1999).

Here, defendant has not shown that any error was "'clearly and unmistakably improper' and 'so egregious' that it deprived [him] of the 'right to have a jury fairly evaluate the merits of his defense.'" Pressley, 232 N.J. at 593-

94 (quoting <u>State v. Wakefield</u>, 190 N.J. 397, 437-38 (2007)). Regarding the

first challenged comment, the prosecutor stated:

> They want you to believe that Judge Cavanagh,
> [P]residing Chancery Court [J]udge[,] would say, you
> know what, there's litigation. The people on one side
> of the litigation, the Greenhalghs, they weren't paid in
> the closing. . . . They want to be paid. There's a dispute
> over the money. We have to have a hearing to
> determine if they're going to be paid, and if they are
> going to be paid, how much they're going to be paid.
>
> . . . .
>
> But, until we have that hearing, I think it's a good
> idea to put $400,000 in the estate account of one of the
> litigants, who doesn't want to pay the other litigant.
> That is what the defendant wants you to believe. I
> suggest to you that it is utterly absurd, flies in the face
> of commonsense, and, frankly, if Judge Cavanagh did
> generate an order like that, then he might not be
> [P]residing Chancery [J]udge for very long.

As to the second challenged remark, the prosecutor stated:

> Remember the check, . . . Eugene M. LaVergne,
> Esquire, Trust Account. It didn't go to Connie Fowler-
> Minck, Estate Account. It went to Eugene LaVergne
> Trust Account. And . . . that's part of what is so
> upsetting, disturbing, [and] shocking about this case is
> because this attorney, an officer of the court, someone
> that Judge Cavanagh appointed to be the escrow agent
> to hold this money . . . . Why? Because he was an
> attorney, and it was going into his trust account. Judge
> Cavanagh trusted that it would be safe there . . . .

The prosecutor continued:

[W]hen you look at all the evidence in this case, you're going to see something very disturbing, that the defendant, an officer of the court, an attorney at law, a court ordered escrow agent[,] violated court orders, violated the relationship that he had with his client, both Connie Fowler-Minck and the Estate of James Fowler, didn't act as a fiduciary . . . , and he breached the trust that Judge Cavanagh had put in him on July 6th of 2009, on August 28th of 2009, on May 13th of 2010, on September 3rd of 2010.  Judge Cavanagh trusted him to do the right thing.  This case is all about him not doing that.

As to the third challenged remark, referring to Judge Kilgallen's October 6, 2010 order, the prosecutor stated "Judge Kilgallen told [defendant] over the phone, it[] [is] in the order, October 15th, be there.  He does[] [not] show up."

As to the fourth challenged remark, referring to Judge Cavanagh's November 4, 2010 order, the prosecutor stated:

This is a long order, it goes on, but it's important for you to sit, digest this order, and talk about it, because when you read this order, there is no mistake. It is unavoidable that the defendant is the escrow agent. On this date, and through the entirety of this case, and nobody who was party to the litigation ever assumed anything otherwise.

And . . . when you go through all of these orders in the case, you'll see that Connie Fowler-Minck isn't ordered to do anything with escrow money, because she's not the escrow agent.

As to the fifth and final challenged remark, the prosecutor stated:

The evidence, and a reasonable view of the evidence adduced during the course of this case, both through the exhibits, through the bank records, and through the testimony of the witnesses establish that [defendant], according to the indictment, was a fiduciary for the estate money of the Estate of James Fowler.

"Prosecutors can sum up cases with force and vigor, and are afforded considerable leeway so long as their comments are 'reasonably related to the scope of the evidence presented.'" Pressley, 232 N.J. at 593 (quoting State v. Timmendequas, 161 N.J. 515, 587 (1999)). "[I]f a prosecutor's arguments are based on the facts of the case and reasonable inferences therefrom, what is said in discussing them, 'by way of comment, denunciation or appeal, will afford no ground for reversal.'" State v. Smith, 167 N.J. 158, 178 (2001) (quoting State v. Johnson, 31 N.J. 489, 510 (1960)). Further, "[a] prosecutor is permitted to respond to an argument raised by the defense so long as it does not constitute a foray beyond the evidence adduced at trial." State v. Munoz, 340 N.J. Super. 204, 216 (App. Div. 2001); see State v. McGuire, 419 N.J. Super. 88, 145 (App. Div. 2011) ("A prosecutor's otherwise prejudicial arguments may be deemed harmless if made in response to defense arguments."). Indeed, "[a] prosecutor may respond to defense claims, even if the response tends to undermine the defense case." Nelson, 173 N.J. at 473.

Here, assessing the propriety of the prosecutor's comments "in the context of the entire trial record," id. at 472 (citing State v. Morton, 155 N.J. 383, 419-20 (1998)), we are satisfied that the prosecutor's comments did not exceed the bounds of propriety. The prosecutor's comments were "reasonably related to the scope of the evidence presented," Frost, 158 N.J. at 82, "based on the facts of the case and reasonable inferences [drawn] therefrom," Smith, 167 N.J. at 178, and "respon[sive] to defense claims." Nelson, 173 N.J. at 473. Moreover, the court's final charge "to disregard the attorneys' comments on the evidence during summation if those comments conflicted with [the jurors'] recollection of the evidence," would "ameliorate potential prejudice." Frost, 158 N.J. at 86-87.

## VI.

In Point V, defendant argues that the "court's erroneous instructions permitted the jury to calculate alleged damages to the [E]state" instead of "the Greenhalghs," which "permitted the jury to conclude that if [defendant] was ordered to hold $200,000 in escrow by Judge Cavanagh and . . . only had $91,555 remaining in his account, the damage to the Estate was $108,445, which is a second degree crime." According to defendant, if the court had instructed the jury that "the Greenhalghs were the alleged victims as identified in the indictment," then "the most the damages could have been were $41,413.15, the

difference between what [defendant] had in his trust account and what was owed to the Greenhalghs," thus reducing defendant's exposure to a third-degree crime.

Having recited the indictment, which, contrary to defendant's assertion, identified the Estate of James Fowler, we conclude that the argument has insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

## VII.

In Point VI, defendant argues, for the first time on appeal, that once judicial notice was taken of the October 6 and November 4, 2010 orders, the judge was required to instruct the jury, sua sponte, that "it may, but [was] not required to, accept as established any fact which has been judicially noticed," pursuant to N.J.R.E. 201(g). Defendant is correct that the judge omitted the charge. However, the rule presupposes that the judge informed the jury of the facts which have been judicially noticed. Here, the October 6 and November 4, 2010 orders were moved into evidence along with all the other documentary exhibits.[10] The judge neither commented on the content of the orders nor instructed the jury as required by N.J.R.E. 201(g). However, defendant did not

---

[10]  As previously discussed, the orders were also admissible under the public records exception to the hearsay rule, pursuant to N.J.R.E. 803(c)(8)(A).

object to the omission. Thus, we review this issue under the plain error standard. State v. Camacho, 218 N.J. 533, 554 (2014).

Under that standard, "we may reverse only if the unchallenged error was 'clearly capable of producing an unjust result.'" Ibid. (quoting R. 2:10-2). In the context of jury instructions, plain error is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Adams, 194 N.J. 186, 207 (2008) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)). "The charge to the jury must be read as a whole in determining whether there was any error." Ibid. Moreover, "[a]lthough arguments of counsel can by no means serve as a substitute for instruction by the court, the prejudicial effect of an omitted instruction must be evaluated in light of the totality of the circumstances—including all the instructions to the jury, [and] the arguments of counsel." Ibid. (alterations in original) (quoting State v. Marshall, 123 N.J. 1, 145 (1991)). "Nevertheless, because clear and correct jury instructions are fundamental to a fair trial, erroneous instructions in a criminal case are 'poor candidates for rehabilitation under the plain error theory.'" Ibid. (quoting Jordan, 147 N.J. at 422).

Here, while the judge erred in omitting the charge, the omission does not rise to the level of plain error in the circumstances of this case. Because the judge did not comment on the contents of the orders, the required instruction regarding judicial notice would have been confusing to the jury. Further, instead of being instructed that "it may, but [was] not required to, accept as established any fact which has been judicially noticed," N.J.R.E. 201(g), the jury was instructed to "consider only the facts which in [their] judgment have been proven by the testimony of the witnesses and/or from the exhibits presented during the course of this trial." We are satisfied that the omission in the instruction was not "clearly capable of producing an unjust result." R. 2:10-2.

VIII.

In Point VII, defendant challenges his sentence as excessive, arguing the "court erroneously applied the aggravating and mitigating factors." We discern no basis to intervene.

"Appellate review of the length of a sentence is limited," State v. Miller, 205 N.J. 109, 127 (2011), and "is governed by an abuse of discretion standard." State v. Blackmon, 202 N.J. 283, 297 (2010). We will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or

40

(3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

[State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Here, the court found aggravating factors three, N.J.S.A. 2C:44-1(a)(3) (risk of "commit[ting] another offense"); four, N.J.S.A. 2C:44-1(a)(4) (taking "advantage of a position of trust or confidence"); nine, N.J.S.A. 2C:44-1(a)(9) ("need for [deterrence]"); and ten, N.J.S.A. 2C:44-1(a)(10) ("fraudulent or deceptive practices committed against any department or division of State government").

As to factor three, the judge explained

Rarely has this [c]ourt seen or observed such obstinance, arrogance, narcissistic comments, and failure to accept responsibility for one's conduct. I sat through this trial. . . . [T]here is no question in my mind[] . . . that you deliberately stole money and, quite frankly, I see nothing in your character and attitude that leads me to believe you wouldn't do it again if afforded the opportunity.

As to aggravating factor four, the court found "a breach of trust" based on defendant's position "as an attorney." As to aggravating factor nine, the court found a "need" for both general and specific deterrence. The court found

aggravating factor ten based on defendant's violation of duly issued court orders and directives.

The judge also found mitigating factors seven, N.J.S.A. 2C:44-1(b)(7) ("led a law-abiding life for a substantial period of time"); and eight ("circumstance[] unlikely to recur"). Regarding mitigating factor seven, the court noted that while defendant had prior contacts with the criminal justice system dating back to 1998, other than one disorderly person offense, the charges resulted in "dismissals." As to mitigating factor eight, the court noted that while defendant may "commit some other theft" in the future, he would never again be appointed "as an escrow agent by the court." However, the court did not "put a lot of weight" on mitigating factor eight. The court determined that the "aggravating factors substantially outweigh[ed] the mitigating factors."

Defendant argues that the proper application of the factors should have resulted in a five-year sentence on the misapplication of entrusted property charge instead of the seven-year term imposed. However, the sentence imposed accounted for the significant weight given the applicable aggravating factors relative to the mitigating factors. See Fuentes, 217 N.J. at 73 ("[R]eason suggests that when the mitigating factors preponderate, sentences will tend toward the lower end of the range, and when the aggravating factors

preponderate, sentences will tend toward the higher end of the range." (quoting State v. Natale, 184 N.J. 458, 488 (2005))).

Affirmed. The matter is remanded to the trial court for the execution of the sentence. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION