# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0043-23

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

FREDDY BRAMBILA,

    Defendant-Respondent.

_____

        Submitted November 7, 2024 – Decided January 8, 2025

        Before Judges Rose, DeAlmeida and Puglisi.

        On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Indictment No. 21-10-0777.

        Elizabeth Parvin, Acting Gloucester County Prosecutor, attorney for appellant (Michael C. Mellon, Special Deputy Attorney General/Acting Assistant Prosecutor, on the briefs).

        Jacobs & Barbone, PA, attorneys for respondent (Louis M. Barbone, on the brief).

PER CURIAM

The State appeals from the July 14, 2023 Law Division order dismissing the indictment with prejudice against defendant Freddy Brambila, and the August 16, 2023 order denying the State's motion for reconsideration. We reverse the dismissal of the indictment and remand for further proceedings.

I.

On September 10, 2019, defendant was charged by complaint-warrant with two counts of second-degree sexual assault, N.J.S.A. 2C:14-2(c)(1). On January 13, 2021, the State presented the case to a grand jury through the testimony of Gloucester County Prosecutor's Office Detective Charlotte McCausland. McCausland testified to the following allegations.

On the night of September 8, 2019, C.O.[1] (Charlotte) and her friend A.H. (Ava) were at a bar where they met defendant, who was Ava's friend. The three consumed alcohol at the bar then left in defendant's pickup truck. After stopping at a drug store, they went to Charlotte's house. Ava stated Charlotte and defendant were kissing and acting intimately towards each other at the bar and later in the truck. As she was leaving Charlotte's house, Ava recorded a video

---

[1] We employ initials and pseudonyms to protect the identity of the victim. R. 1:38-3(c)(12).

A-0043-23

of Charlotte and defendant kissing on the front lawn. Ava later advised officers the video was "lost through Snapchat."

Charlotte reported that after Ava left, defendant became more forceful towards her. He put his leg behind her leg, tripped her, and pushed her down to the ground. Charlotte repeatedly told defendant to stop, and tried to get away from him by squirming and "flipping over," but he pulled her back by her leg. Defendant penetrated Charlotte's vagina and anus with his fingers, and then penetrated her vagina with his penis.

Charlotte was able to get away and run inside her home, where her mother and sister found her without her shorts on, "laying in a fetal position hysterically crying." Charlotte told them she was in pain and "it hurt down there."

Video from body worn cameras of responding law enforcement officers described by the detective to the grand jurors and showed Charlotte "upset, frantic, crying hysterically, . . . [in] pain and . . . lying on the floor." Charlotte "stated that she had told him to stop, stop, multiple times."

Ava showed investigating officers defendant's social media page, which identified him by name. An hour later, officers found defendant asleep in his truck, "incoherent and smell[ing] of alcohol." Through a photo array, Charlotte identified defendant as her assailant. Charlotte went to the hospital, where a

3

nurse conducted a forensic medical examination, which was documented in a report.[2]

During the grand jury's deliberations, the following colloquy occurred between a juror, the assistant prosecutor and the detective:

JUROR:        I have a question.

PROSECUTOR:  Sure.

JUROR:        Was a medical examination done on the victim at any point in time?

DETECTIVE:  Yes, she did go to the hospital, yes.

JUROR:        And, based on that medical examination, did it show that it potentially could have been forced?

DETECTIVE:  Uh.

PROSECUTOR:  Actually, if I could just—

DETECTIVE:  Sure.

PROSECUTOR:  Detective, if you are qualified to answer that. If you are not qualified to answer that specific question, then I'm going to ask you not to.

DETECTIVE:  Yeah, that's fine. Yeah, I'm not.

---

[2] Although the report documenting the examination is entitled "State of New Jersey Forensic Medical Examination Report," it is also referred to as a Sexual Assault Nurse Examination (SANE) Report in the grand jury and trial court proceedings.

4

PROSECUTOR: Yeah.

JUROR: Okay.

PROSECUTOR: We can ask more specifics. The night of this incident did she go to one of the area hospitals?

DETECTIVE: Yes she did.

PROSECUTOR: And, did she get a . . . sexual examiners forensic exam?

DETECTIVE: Yes she did.

PROSECUTOR: And, was she examined by a forensic nurse?

DETECTIVE: Yes she was.

JUROR: Okay. Thank you.

At the conclusion of the hearing, the grand jury indicted defendant under the prior indictment number 21-01-0020, for the same offenses charged in the complaint-warrant.

Defendant moved to dismiss the indictment, arguing that the State failed to present the following evidence, which he claimed was exculpatory: Ava's statement that Charlotte had not just been drinking alcohol but was "highly intoxicated," Ava's observation of Charlotte and defendant "not just kissing," but having "continued consensual physical intimate contact . . . over the course

A-0043-23

of two hours," conduct which Ava termed "hooking up," and the fact that the forensic examination report did not document any observations of injury or force to Charlotte.

During argument on the motion, defense counsel noted he had provided to the State an audio recording of Ava's statement to the police and the six-second video she had taken, which apparently had not been deleted.[3] The State countered that none of this information was clearly exculpatory, and the criminal offenses charged did not require injury to the victim.

The court issued its oral decision:

> [T]he case law is pretty clear. The grand jury isn't just a rubber stamp for the State. If there's exculpatory evidence, it's got to be presented to the grand jury and I understand[ the State's] argument is that, well, it's not completely exculpatory. But the question is, isn't that for the grand jurors to decide whether or not it's exculpatory or not exculpatory.
>
> And I think the other concern I had is when . . . the grand juror . . . asked about the potential medical examination . . . , it's kind of just glossed over and there's really no response given when there was—[a] nurse evaluation with conclusory findings.

---

[3] Because neither motion judge reviewed the audio recording of Ava's statement or the video she recorded, we denied the State's motion to supplement the record on appeal with these items.

6

And I think the <u>State v. Gaughran</u> case[4] . . . is . . . pretty much on point with regard to the grand jury not being provided all of the relevant facts. And I think, you know, in order for the grand jury to make an adequate determination and <u>Gaughran</u> says in order to assure an independent and fair grand jury system in the State of New Jersey, it is essential the grand jury be informed of the relevant facts. A different and conflicting side of the story is by definition [a] relevant fact.

[H]ere . . . there's a contradictory version that was not presented to the grand jurors for whatever reason, I don't know. As I indicated, it was a rather perfunctory presentment and I know, you know, the courts are loath[] to dismiss grand jury indictments, unless there's a palpably deficient presentment or if, in fact, grand jurors are not presented with exculpatory information which should be presented.

In fact, I do find in this case that the grand jury was not provided with the adequate relevant facts, they were not provided with necessary exculpatory information, . . . the grand juror's question was not answered with regard to the medical examination.

So for those reasons, I am going to grant the defense's motion on dismissing of the indictment against [defendant]. The State can choose to represent it if they want to—I think that this is a deficient presentment. I think that it was—I'm not going to say intentional. I think—I don't know why they chose not to present what they didn't present, but I think it's depriving the grand jurors of relevant facts that they need in order to make an assessment and not just rubber stamp the State's presentment.

---

4  <u>State v. Gaughran</u>, 260 N.J. Super. 238 (Law Div. 1992).

Two weeks later, the State re-presented the case to another grand jury. In addition to testifying about the previous facts, McCausland provided additional details about the incident and investigation, as follows.

Charlotte "had been drinking and she was intoxicated that night." The stop at the drug store was for Charlotte to buy an e-cigarette, which she accomplished without any assistance. Charlotte said she urinated on defendant while trying to fend him off and she "zoned out" while on her back. Charlotte believed defendant stopped the assault because she saw headlights pass the house at least three times. Charlotte's mother and sister heard the family dog barking between 11:00 p.m. and midnight, looked out the window and saw a white pickup truck. When her mother and sister found her, Charlotte's shorts were on the floor and leaves were in her hair. Charlotte told them defendant forced her to the ground under the willow tree by their driveway, and "tore off her shorts."

The detective also provided additional details about Charlotte's interaction with defendant that evening. While Ava, Charlotte and defendant were drinking at the bar, defendant was "all over" Charlotte, touching her shoulders. When they went to the drug store, Charlotte and defendant were "making out in the parking lot." And when Ava left Charlotte's house, she saw Charlotte and

defendant "kissing next to his truck," which she recorded on her cell phone to "show [Charlotte], later, that she was . . . 'a mess.'" The video was forwarded to the prosecutor's office, and the detective viewed it.

The detective testified the quality of the video was "not great," because it was "pretty grainy" and was taken "from a distance" from the residence. However, the video showed "two figures on the lawn of [Charlotte]'s residence."

PROSECUTOR: And it appears that there's a female that's bent over, and a male standing behind her?

DETECTIVE: I don't recall that exact portion of the video, no.

PROSECUTOR: Okay.

DETECTIVE: But I do remember that it was grainy in quality.

PROSECUTOR: Okay. But essentially, [Ava] is viewing, in that video, what she believes [to be] the victim and the defendant having sex?

DETECTIVE: Correct.

PROSECUTOR: And that she believed that it was a consensual act that she was—

DETECTIVE: Correct.

PROSECUTOR: —watching? Okay. However, the only sound that you can really hear is [Ava]'s own voice?

9 A-0043-23

DETECTIVE:      Correct.

PROSECUTOR:   Okay.  So you couldn't hear if there was any—you couldn't hear what [Charlotte] was saying, if she was saying anything in the video?

DETECTIVE:      No.

The detective also testified that she took photos of Charlotte's arms and legs that evening, and observed "bruises and scrapes on her arms."  Charlotte said these injuries were a result of the assault and from defendant's grabbing and dragging her.

The detective also testified about the forensic examination report:

PROSECUTOR:   Okay.  Now, did [Charlotte] go to the hospital?

DETECTIVE:      Yes, she did.

PROSECUTOR:   And she first went to Kennedy, and then she was seen by a forensic nurse, is that right?

DETECTIVE:      Correct.

PROSECUTOR:   And essentially—Now, did you have an opportunity to review the report from the, it's a SANE nurse, a sexual assault nurse examiner?

DETECTIVE:      Yes.

10

PROSECUTOR: And she noted in her report the history provided by [Charlotte], is that right?

DETECTIVE: Correct.

PROSECUTOR: And is that, what she told the nurse, consistent with what she told Detective Longfellow?

DETECTIVE: Correct.

PROSECUTOR: Okay. But the SANE nurse didn't really note any of her own observations?

DETECTIVE: No.

A grand juror then indicated a question:

JUROR: So I thought originally you had said that she got out of the pickup truck, defendant came over and they started to kiss, and then he tripped her—

PROSECUTOR: Um-hum.

JUROR: —onto the ground.

PROSECUTOR: Um-hum.

JUROR: And then, I thought the officer just said that she was videotaping, as grainy as it was, but it looked like they were—were they prone or were they on the ground?

PROSECUTOR: So I'll ask maybe some clarifying, and then if you want to—

11

A-0043-23

PROSECUTOR: So did [Ava] indicate as she was leaving, pulling away, [Charlotte] and the defendant were kissing?

DETECTIVE: Correct, that's what she had told the detective and I [sic].

PROSECUTOR: And then when she was a little further distance from, from the residence—it's the front yard of [Charlotte]'s residence, so it's purported to be [Charlotte] and the defendant?

DETECTIVE: Correct.

PROSECUTOR: And you said you don't recall, but it appears that they're engaged in some kind of sexual act in that video?

DETECTIVE: Correct.

PROSECUTOR: Okay. Do you have any follow up, based on that?

JUROR: No, I was just trying to figure out that distinction of being thrown on the ground—

PROSECUTOR: Um-hum.

JUROR: and then not more than a minute, I think you said that she was bent over, which it just didn't seem consistent with what she originally had said.

PROSECUTOR: Well, detective, you said you don't recall exactly what position they were in in the video?

12

DETECTIVE: I don't. To be honest, it's been quite some time since I reviewed the video, and, like I said, it's quite grainy, and it's not the best quality video, so it's difficult to say exactly who was in what position and how—in the video, and it's a very short video.

JUROR: Oh, okay. Thank you.

PROSECUTOR: Yes.

A second juror then asked a question:

JUROR: But nobody saw her being thrown down? They saw them kissing, and then they saw them engaged, but nobody actually saw the actual tripping (inaudible).

DETECTIVE: No, no one else reported that they witnessed the act, no.

PROSECUTOR: But she—And also on that, [Ava] was driving away—

DETECTIVE: Correct.

PROSECUTOR: —so arguably, she wasn't paying attention to the yard the entire time she was driving?

DETECTIVE: That's correct. She was leaving the residence.

The grand jury again returned an indictment on both charges.

13

On July 14, 2022, defendant moved to dismiss the second indictment. On February 21, 2023,[5] the trial court heard argument on the motion. Defense counsel maintained the State failed to sufficiently present two pieces of exculpatory evidence: Ava's statement and video, and the forensic examination report. He argued the video should have been played for the grand jury because it depicted the "actual act of sex[6] between [Charlotte] and defendant and, most importantly, [Ava]'s conclusion and testimony that the sex was consensual."

As to the report, defense counsel argued the detective "lie[d]" when she testified "[t]he nurse failed to note the observations."[7] He also objected to the detective's failure to review the video in preparation for her testimony, and to

---

[5] According to the State, the motion was initially scheduled for September 13, 2022, but was adjourned one week at the State's request; adjourned to November 16, 2022, at defendant's adjournment request; and then adjourned twice due to the court's calendar until it was heard on February 21, 2023.

[6] As we discuss further in this opinion, Ava's statement, as presented in defendant's merits brief, does not clearly indicate she observed an act of sexual intercourse.

[7] Although defense counsel cited the grand jury transcript at page twenty-three, line five, he misstated the actual testimony. The detective did not testify the nurse "failed" to note her observations, rather she agreed that the "nurse didn't really note any of her observations." We are unpersuaded this testimony was misleading.

the State's assertion that when Ava recorded the video, she was driving away and not paying attention.

The court again rendered an oral decision:

> Well the case law is clear. I mean, the only force that's necessary is the force that's needed to engage in the act of penetration. So, there's—no one—this is not the olden days—and correctly so where—you know—it has to [be] demonstrated the woman, you know, was—you know—was physically, you know, held down and had to fight back and all that—you know—nonsense that, fortunately, is not with us any longer. The only force that's necessary is the force necessary to complete the act of penetration, period.
>
> So, whether or not somebody actually did throw somebody to the ground, doesn't negate, you know, whether or not there was consensual sex. I understand that. But . . . given the manner in which it's described that the incident took place then that becomes, essentially—and this court does find it exculpatory here in this particular case.
>
> I—granted, it's not often that . . . the State has a case where the actual act is captured on a video, regardless of whether it's crystal clear or grainy. But—and, again, it could be argued that—you know—the video wasn't started until after the—you know—the sex had already started and didn't capture whether or not anything happened. But, certainly, the State has some information from this witness that says that didn't happen.
>
> You know, . . . in order to meet the requirements of—you know—Engle and Murphy and other cases that speak to the issue and I'm citing, you know, more to

15

appellate level cases but <u>Gaughran</u> is certainly very instructive as to this issue. I mean, those are important—well they're vital to the grand jury system to ensure that—again, the State doesn't have to make the defendant's case. It's pretty clear that, you know, the State's not required to do that. It's supposed to present exculpatory evidence. But in this particular case in the unusual circumstance where you do have an eye-witness—there is a video, there—and there is a SANE report that speak to really issues that these grand jurors, which not all of the time happens. Grand jurors many times don't necessarily have any questions.

But this—in this particular case, the grand jurors had questions right on point. And it appears that the evidence that the grand jurors were looking for was at the State's disposal and was not made available to them or was colored in such a way—and I understand there may be reasons for it or the detective felt constrained about certain information that could be provided—but it was there and, nonetheless, not provided to the grand juror. I'm not going to say it was purposely withheld or subverted or—but it, essentially, amounts to it if it's not given to the grand jurors and clearly the State has it. So that's my—and I'm inclined to grant the motion for that reason, and I am going to grant the motion.

Two and a half weeks after the second dismissal, defendant moved to amend the order to a dismissal with prejudice, claiming his due process rights were violated because four years had elapsed since the incident occurred. The motion was originally scheduled for oral argument on April 14, 2023, but was adjourned twice due to scheduling conflicts. On July 14, 2023, the court granted defendant's motion and dismissed the indictment with prejudice, noting the State

16

failed to re-present the case to the grand jury following the dismissal without prejudice.

The State moved for reconsideration, relying on the assistant prosecutor's certification, which explained the State did not re-present the case because the assigned detective was out on leave and was scheduled to return on June 1, 2023, at which time the assigned assistant prosecutor had just begun leave. The assistant prosecutor further explained "the State felt it would be improper to re-present the matter when there was a pending motion [to dismiss with prejudice] on the very issue." On August 16, 2023, the court denied the State's motion for reconsideration.

II.

The State raises the following issues for our consideration:

POINT I

NONE OF THE EVIDENCE DEEMED CLEARLY EXCULPATORY BELOW WAS ACTUALLY EXCULPATORY.

A. THE VIDEO, WHICH THE COURT BELOW DID NOT VIEW, IS OF SUCH POOR QUALITY THAT IT IS INDISCERNIBLE AND IS THUS NOT RELIABLE.

B. THE SANE EXAMINATION DOES NOT NEGATE AN ELEMENT OF THE OFFENSE.

17

A-0043-23

C.  WITNESS [AVA] DID NOT OBSERVE DEFENDANT AND THE VICTIM HAVING SEX.

D.  WITNESS [AVA]'S STATEMENT, ALTHOUGH NOT CLEARLY EXCULPATORY, WAS NEVERTHELESS ADEQUATELY EXPLAINED TO THE GRAND JURY DURING THE SECOND PRESENTATION.

## POINT II

DEFENDANT'S DUE PROCESS RIGHTS WERE NOT VIOLATED.

A.  THE FIRST TWO PRESENTMENTS WERE BROUGHT IN AN APPROPRIATE AMOUNT OF TIME.

B.  THE LIMITATION ON SUCCESSIVE PRESENTMENTS IS NOT APPLICABLE WHERE THE GRAND JURY TRUE-BILLED, BUT THE COURT IMPROPERLY DISMISSED THE INDICTMENT.

## POINT III

NOTIONS OF JUDICIAL FAIRNESS, EFFICIENCY AND ECONOMY SUPPORTED WAITING TO RE-PRESENT THE CASE UNTIL THE MOTION TO DISMISS WITH PREJUDICE WAS DECIDED.

"We review a trial court's dismissal of an indictment for abuse of discretion." State v. Tringali, 451 N.J. Super. 18, 27 (App. Div. 2017). "A court abuses its discretion when its 'decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible

basis.'" State v. Chavies, 247 N.J. 245, 257 (2021) (quoting State v. R.Y., 242 N.J. 48, 65 (2020)).

"When the decision to dismiss relies on purely a legal question, however, we review that determination de novo." State v. Twiggs, 233 N.J. 513, 532 (2018). We must ensure the trial court employed the correct legal standard in dismissing the indictment. State v. Abbati, 99 N.J. 418, 436 (1985). "At the grand jury stage, the State is not required to present enough evidence to sustain a conviction." State v. Feliciano, 224 N.J. 351, 380 (2016). Although a motion to dismiss is within the discretion of the trial court, "[a]s long as the State presents 'some evidence establishing each element of the crime to make out a prima facie case,' a trial court should not dismiss an indictment." Ibid. (quoting State v. Saavedra, 222 N.J. 39, 57 (2015)). "An indictment should be disturbed only on the clearest and plainest ground[s],' . . . and 'only when the indictment is manifestly deficient or palpably defective.'" State v. Shaw, 241 N.J. 223, 239 (2020) (alteration in original) (first quoting State v. Perry, 124 N.J. 128, 168 (1991); and then quoting State v. Hogan, 144 N.J. 216, 229 (1996)).

A prosecutor's duty to present exculpatory evidence to a grand jury is limited. The grand jury cannot be denied evidence that is "credible, material, and so clearly exculpatory as to induce a rational grand juror to conclude that

the State has not made out a prima facie case against the accused." Hogan, 144 N.J. at 236. In establishing its prima facie case, "the State may not deceive the grand jury or present its evidence in a way that is tantamount to telling the grand jury a 'half-truth.'" Ibid. Therefore, the duty to disclose arises "only in the rare case" when the prosecutor has actual knowledge that the evidence "both directly negates the guilt of the accused and is clearly exculpatory." Id. at 237.

Regarding the first requirement, the primary focus is "whether the State has made out a prima facie case of the accused's guilt." Ibid. There is no duty to present evidence "unless the exculpatory evidence at issue squarely refutes an element of the crime in question." Ibid.

"The second requirement, that the evidence in question be 'clearly exculpatory,' requires an evaluation of the quality and reliability of the evidence." Ibid. Courts must examine "the exculpatory value of the evidence . . . in the context of the nature and source of the evidence, and the strength of the State's case." Ibid. "'Clearly exculpatory' evidence . . . must bear some significant stamp of credibility, in and of itself, and not merely be contradictory of the state's other proofs." State v. Evans, 352 N.J. Super. 178, 195 (App. Div. 2001).

Furthermore, "only in the exceptional case will a prosecutor's failure to present exculpatory evidence to a grand jury . . . constitute grounds for challenging an indictment." Hogan, 144 N.J. at 239. Failure to disclose the evidence must give rise to a "distorted version of the facts." Id. at 236.

Potentially exculpatory evidence must be viewed in light of the elements of the criminal offense. Defendant was charged under N.J.S.A. 2C:14-2(c)(1), which provides "[a]n actor is guilty of sexual assault if the actor commits an act of sexual penetration with another person . . . [and] commits the act using coercion or without the victim's affirmative and freely-given permission, but the victim does not sustain severe personal injury."

To sustain an indictment for second-degree sexual assault under N.J.S.A. 2C:14(c)(1), the State must present prima facie evidence for each of the following elements: (1) the defendant committed an act of sexual penetration with another person; (2) the defendant acted knowingly; (3) the defendant used physical force or coercion; and (4) the victim did not sustain severe personal injury. Model Jury Charges (Criminal), "Sexual Assault (Force/Coercion) (N.J.S.A. 2C:14-2(c)(1))" (rev. Jan. 24, 2005). "Physical force" is defined as "the commission of the act of sexual penetration without the victim's freely and

affirmatively given permission to the specific act of penetration alleged to have occurred."  Ibid.

Against this legal backdrop, we first consider whether the forensic examination report was exculpatory.  It is unclear from the trial court's oral opinion whether it considered the report exculpatory because it did not document any evidence of physical injury to Charlotte, or because it "contradicted" her testimony that she was pulled to the ground.  In either case, we are persuaded the trial court mistakenly determined the report was exculpatory.

Pertinent to this issue, the report contains a section entitled "Physical Examination and Collection of Specimens."  Under this section, the subheading "Physical Assessment" instructs the examiner:  "Perform a full skin surface assessment and visual inspection.  Document findings on the supplemental body diagram and photograph the area with and without scale."  The subheading "Genital Inspection" instructs the examiner:  "Perform visual inspection of external genital area for signs of injury or other findings.  Document findings on the supplemental genital diagram."  Under the subheading "Supplemental Documentation of Injuries and Findings," which does not contain any

instruction, the examiner checked the "No" box for both "Photographs" and "Supplemental Diagrams."

The trial court agreed with defendant's assertion that the lack of photographs and supplemental diagrams in the report indicated there were no visible signs of injury to Charlotte, which rendered the report exculpatory evidence. We disagree for two reasons. First, the absence of visible signs of injury does not negate an element of the offense of sexual assault. As the trial court recognized, there is no requirement for the State to show injury, and the only "physical force" necessary is the act of penetration without the victim's consent. The documented lack of bodily bruising or injury to the genital area is therefore not exculpatory.

To the extent the trial court determined the report "contradict[ed]" Charlotte's version of events, that finding is also unsupported by the record. Charlotte reported defendant put his leg behind her leg and tripped her to the ground, she struggled to get away from him, and he pulled her back by her leg. She stated defendant inserted three fingers in her vagina and her anus, and then inserted his penis in her vagina. She pulled herself up on branches and "finally got away."

We disagree with the trial court's determination the facts alleged here are analogous to Gaughran. In Gaughran, the victim alleged the defendant "penetrated her anally with his finger and penis, and vaginally with his finger. He also . . . forcibly performed cunnilingus several times. She claim[ed] to have fought him throughout the assault which lasted roughly an hour and a half." 260 N.J. Super. at 285. The SANE report in that case did not document any injuries. Ibid. The trial court therefore found the SANE report exculpatory because "[i]t directly contradict[ed] the victim's claim of anal and vaginal penetration and d[id] not support her claim of a one-and-a-half-hour struggle." Id. at 290. Thus, the court found the State's failure to present the report "skillfully misled" the grand jury into believing the report corroborated the victim's testimony, which constituted "an 'intentional subversion' of the [grand jury] process." Id. at 290-91 (quoting State v. Murphy, 110 N.J. 20, 35 (1998)). Unlike Gaughran, nothing in the examination report here is incompatible with Charlotte's statement describing the assault.

We also note the detective testified she observed and photographed bruises and scrapes on Charlotte's arms. While this testimony is at odds with the documentation in the forensic report, a "grand jury's role is not to weigh evidence presented by each party, but rather to investigate potential defendants

and decide whether a criminal proceeding should be commenced." Hogan, 144 N.J. at 235. "Credibility determinations and resolution of factual disputes are reserved almost exclusively for the petit jury," and "[i]n seeking an indictment, the prosecutor's sole evidential obligation is to present a prima facie case that the accused has committed a crime." Id. at 235-36. Because nothing in the forensic report constituted "physical evidence of unquestioned reliability demonstrating that the defendant did not commit the alleged crime," id. at 238, we are persuaded the trial court erred in its determination the report was exculpatory.

We next turn to the six-second video, which purports to show defendant and Charlotte engaged in some act[8] on the front lawn, and Ava's statement she believed the act to be consensual. There is no dispute the video has no sound, was taken from some distance away, and does not depict the entire encounter. Even assuming the video captured what Ava believed to be a consensual encounter of a sexual nature, it is nevertheless not exculpatory. The video does

_____

[8] During the State's second grand jury presentation, the assistant prosecutor elicited from the detective testimony indicating the video showed defendant and Charlotte in a sexual act. However, defendant's merits brief recites pertinent portions of Ava's statement, none of which clearly indicates she saw what she believed to be an act of sexual intercourse. Rather, Ava stated she saw Charlotte and defendant with their arms around each other "making out" on the front lawn and when she left, they were "hooking up."

 A-0043-23

not negate an element of the offense, nor does it directly contradict Charlotte's statement that defendant became more aggressive and sexually assaulted her after Ava left.

Lastly, although Ava reported she knew Charlotte's statement "about being forced or tackled to the ground did not happen," this statement likewise is not exculpatory. As the Court in Hogan made clear, "[T]he exculpatory testimony of one eyewitness is not clearly exculpatory if contradicted by the incriminating testimony of a number of other witnesses." 144 N.J. at 238; see also Evans, 352 N.J. Super. at 195 ("Conflicting eyewitness testimony cannot be clearly exculpatory . . . because it would require an assessment by the grand jurors of the credibility of the various witnesses, their opportunity to observe, recall and recollect the events as stated in their conflicting testimony."). Charlotte's mother and sister reported they both saw her immediately after the incident, and that Charlotte was crying and said she was hurt and had been assaulted. Responding police officers also observed Charlotte's upset demeanor, documented bruises and scrapes on her arms, and heard Charlotte's statement she "said no." Thus, Ava's statement could not be clearly exculpatory because that determination requires a credibility assessment, which is beyond the purview of the grand jury. See Hogan, 144 N.J. at 235.

A-0043-23

Because we are convinced the dismissal of the indictment was in error, we need not address the State's remaining arguments. We also decline to consider defendant's argument that his Fifth Amendment rights were violated, which the trial court determined was harmless error, because he did not file a cross-appeal. See State v. Watson, 254 N.J. 558, 609 (2023) (quoting State v. Lefante, 14 N.J. 584, 589-90 (1954)) (absent a cross-appeal, a respondent may only argue "any points that will sustain his judgment").

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0043-23